**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

In re: )
)
Jennifer Naylor Freeman, ) Case No.: 03-00663-BGC-13
)
Debtor. )

Jennifer Naylor Freeman, )
)
Plaintiff, )
)
vs. ) AP No.: 04-00002-BGC-13
)
Ameriquest Mortgage )
Company, et al., )
)
Defendants. )

**Memorandum Opinion**
**on the Defendants' Motions to Dismiss**

The matters before the Court are:

1.  The Fidelity National Title Company of New York's Motion to Dismiss filed on February 11, 2004;
2.  The Ameriquest Mortgage Company's Motion to Dismiss filed on February 13, 2004;
3.  A second Motion to Dismiss filed by Ameriquest Mortgage Company on February 13, 2004;
4.  The Ameriquest Mortgage Company's Supplemental Motion to Dismiss and Legal Memorandum in Support Thereof with Respect to the Additional Claims filed by the Plaintiff filed on March 31, 2004; and
5.  The Fidelity National Title Company of New York's Supplemental Motion to Dismiss and Legal Memorandum in Support Thereof with Respect to the Additional Claims filed by the Plaintiff filed on March 31, 2004.

After notice, a hearing was held on April 14, 2004. Mr. Walter McArdle, the plaintiff's attorney; Mr. Eric Ray and Mr. Jeremy Rutherford, attorneys for the defendant, Ameriquest Mortgage Co.; Ms. Wendy Johnston, attorney for the defendant, City of Mountain Brook; and Mr. Charles King, attorney for the Chapter 13 trustee, appeared.

The matters were submitted on the pleadings, representations, briefs and arguments of counsel.

For the reasons expressed below, the Court finds that:

1. **As to all defendants**, the motions to dismiss should be granted as to Counts **I, II, III, IV, V, VII, IX, X, XI, XII, XIII,** and **XIV**; and

2. **As to all defendants, except the City of Mountain Brook**, the motions should be granted as to Counts **VI** and **VIII**.

## I. Allegations

Paragraphs 9 through 44 of Ms. Freeman's complaint contain her substantive factual allegations. Paraphrased by the Court, those are:

1. On October 1, 1997, Ms. Freeman was divorced from William Freeman. First Amended Complaint, page 3, paragraph 11.

2. The divorce decree required Mr. Freeman to transfer the parties' homestead to Ms. Freeman, and for her to satisfy the loan that was secured by a mortgage on the property. First Amended Complaint, page 3, paragraphs 12-13.

3. In October 1997, Ms. Freeman asked the Defendant, Ameriquest, for a mortgage loan to pay off the existing mortgage debt. First Amended Complaint, page 3, paragraph 13.

4. Ms. Freeman told Ameriquest, "that she needed to refinance the house in her own name and needed the house out of her husband's name," and that, "she wanted the title to the house out of her husband's name and solely in her own name." First Amended Complaint, page 3, paragraph 13; page 4, paragraph 15.

5. "Also present during discussions concerning the making and closing of the loan were representatives of the title insurance company issuing title insurance on the property and who would also close the loan." First Amended Complaint, page 3-4, paragraph 14.

6. The "Defendants' representatives" asked Ms. Freeman to provide them with a copy of her divorce decree, which she did. First Amended Complaint, page 4, paragraph 15.

7. The "Defendants' representatives" told Ms. Freeman that they would and could do as she asked, that is, upon the closing of the loan, the title to the property

2

would be in her name alone, subject to Ameriquest's mortgage lien. <u>First Amended Complaint</u>, page 4, paragraph 15.

8. "The Defendants' representatives represented to the Plaintiff that all of the documentation necessary to close the loan and secure the transaction was completed." <u>First Amended Complaint</u>, page 4, paragraph 16.

9. The Ameriquest mortgage loan to Ms. Freeman was closed on October 6, 1997. At closing, Ms. Freeman, "paid $587.00 for title insurance on the property and $100.00 in attorneys fees." <u>First Amended Complaint</u>, page 6, paragraph 18.

10. The "Defendants' representatives" did not solicit or obtain a deed from Mr. Freeman because they were of the opinion that Ms. Freeman was the, "the sole owner of the subject property and that title was in her name," by virtue of her divorce decree. Consequently, following the loan closing, title to the property remained in the name of both Mr. and Ms. Freeman which, according to the latter, constituted a "defect in the title." <u>First Amended Complaint</u>, page 4, paragraph 16; page 6, paragraph 18.

11. The Defendants owed a duty to Ms. Freeman, in connection with the October 6, 1997, loan, to conduct a "proper title search," but did not. <u>First Amended Complaint</u>, page 6, paragraph 19.

12. On May 6, 1998, the State of Alabama recorded a tax lien notice in the probate court for the county in which the property is located for $5,112.67 in taxes that were owed by Mr. Freeman, but not Ms. Freeman. <u>First Amended Complaint</u>, page 6, paragraph 20.

13. On September 16, 1998, First Commercial Bank recorded a certificate of judgment in the probate court for the county in which the property is located based on a $1,500.00 judgment that it had obtained against Mr. Freeman, but not Ms. Freeman. <u>First Amended Complaint</u>, page 6, paragraph 21.

14. On November 16, 1998, Ms. Freeman obtained another mortgage loan from Ameriquest, which she used to pay off the one that she had obtained from Ameriquest on October 6, 1997. At the loan closing, Ms. Freeman paid "$515.00 for title insurance and $75.00 for attorneys' fees related to procuring the title insurance." <u>First Amended Complaint</u>, page 6, paragraph 22.

15. The "Defendants" owed a duty to Ms. Freeman, in connection with the November 16, 1998, loan, to conduct a title examination, but did not. <u>First Amended Complaint</u>, page 6, paragraph 23.

16. On November 21, 2000, Ms. Freeman obtained another mortgage loan from Ameriquest, which she used to pay off the one that she had obtained from Ameriquest on November 16, 1998. <u>First Amended Complaint</u>, page 7, paragraph 24. At the loan

closing, Ms. Freeman paid, "a title search fee of $200.00, and a $438.00 fee for title insurance." First Amended Complaint, page 7, paragraph 25.

17. The "Defendants" owed a duty to Ms. Freeman, in connection with the November 21, 2000, loan, to conduct a title examination, but did not. First Amended Complaint, page 7, paragraph 26.

18. On December 14, 2000, the City of Mountain Brook recorded a certificate of judgment in the probate court for the county in which the property is located based on a $17,123.00 judgment that it had obtained against Mr. Freeman, but not Ms. Freeman. First Amended Complaint, page 7, paragraph 27.

19. Ms. Freeman entered into a contract for the sale of her property. The sale was scheduled to close on November 27, 2002. The date the contract was made is not specified by Ms. Freeman in her complaint. First Amended Complaint, page 7, paragraph 28.

20. "A few days prior to the scheduled closing date," the closing attorney informed Ms. Freeman that title to the property remained in both her and Mr. Freeman's names; informed her about the tax lien notice which had been recorded by the State of Alabama; and informed her about the certificates of judgments that had been recorded by First Commercial Bank and the City of Mountain Brook. First Amended Complaint, pages 7-8, paragraph 29.

21. The status of the property, "prevented Ms. Freeman from giving the purchasers clear title to the property and rendered the title unmarketable," and required the sale to be aborted. First Amended Complaint, page 8, paragraph 29.

22. On November 26, 2002, through her attorneys, Ms. Freeman made demand on Ameriquest to take action to clear the title to the property. First Amended Complaint, page 8, paragraph 32.

23. On December 20, 2002, though her attorneys, Ms. Freeman made demand on Fidelity National Title Insurance Company of New York, to take action to clear the title to the property. First Amended Complaint, page 8, paragraph 32.

24. "[N]one of the Defendants have taken any actions to clear the title to the property...." First Amended Complaint, pages 8-9, paragraph 32.

25. Ms. Freeman defaulted on the debt that she owes to Ameriquest, which consequently commenced foreclosure proceedings, "forcing Plaintiff to file Chapter 13 Bankruptcy to stop the foreclosure until this matter could be resolved." First Amended Complaint, page 9, paragraph 34.

4

26.  "Plaintiff presumed a deed and/or whatever other documentation was necessary to place fee simple title of the property solely in her name had been obtained by Defendants because of their assurances to her that they had the knowledge and the expertise to handle such a transaction."  First Amended Complaint, page 9, paragraph 35.

27.  "Plaintiff asserts that she is a direct, or third party beneficiary of the title insurance policies issued by Defendants or the duty of the Defendants to conduct title searches, because she paid for title insurance and title searches on the property."  First Amended Complaint, page 10, paragraph 38.

## II.  Findings of Fact
## and Conclusions of Law

In the remainder of her complaint, Ms. Freeman alleges 14 causes of action against the defendants.  Through those actions, she claims both compensatory and punitive damages.

The defendants Ameriquest and Fidelity moved for dismissal of Ms. Freeman's complaint on the grounds that the complaint fails to state any claim against them upon which relief may be granted.

In this Circuit, dismissing a complaint for failure to state claim is proper only if it is clear that no relief can be granted under any set of facts that could be proved consistent with the allegations contained therein.  Blackston v. Alabama, 30 F.3d 117, 120 (11th Cir. 1994). In Kirby v. James, 195 F.3d 1285, 1289 (11th Cir. 1999), the Court of Appeals for the Eleventh Circuit recognized, "When considering a Rule 12(b)(6) motion to dismiss, a court must accept the allegations in the complaint as true, construing them in the light most favorable to the plaintiffs."  In addition, such motions should be granted only if the defendants demonstrate, "beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitled [her] to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957) (parentheticals added).

In evaluating this complaint's legal sufficiency, it is important to recognize that the first five counts of Ms. Freeman's complaint, from a factual standpoint, are based on three distinct incidents, involving purported wrongdoing on the part of one or more of the defendants.  Each incident occurred at a separate time.

The first incident occurred on October 6, 1997, when the first Ameriquest loan was closed.  The second incident occurred on November 16, 1998, when the second Ameriquest loan was closed. The third incident occurred on November 21, 2000, when the third Ameriquest loan was closed.

As discussed in detail below, in the first five counts of her complaint, Ms. Freeman failed to delineate clearly which of the particular incidents her theories

specifically relate to, leaving the impression that she intended every theory to apply to every incident. However, it is apparent from the wording of some of those counts that the theories expressed are incongruent with and cannot apply to all three of the incidents, although in <u>Counts I</u>, <u>II</u>, <u>III</u>, and <u>V</u>, Ms. Freeman combined transactions and defendants without delineating which one did what in relation to which transaction.[1]

Given the above, the Court has attempted to apply each of Ms. Freeman's legal theories separately to each defendant in relation to each of the distinct factual incidents upon which those counts are based. In addition, the Court has attempted to identify, where appropriate, where the legal contentions contained in a particular count are incongruent with Ms. Freeman's factual allegations and where they cannot, as a matter of law, result in a recovery for her based on those factual allegations.

### A. Count I - Negligence or Wantonness

### 1. Ms. Freeman's negligence and wantonness claims are incongruous and fail to state claims against the defendants upon which relief may be granted.

In <u>Count I</u> of her complaint, Ms. Freeman alleged that the defendants, "negligently, recklessly or wantonly failed to discover that the Plaintiff only owned a one half (½) interest in the property, and that judgment liens against the Plaintiff's ex-husband had been or might be recorded against the property." <u>First Amended Complaint</u>, page 11, paragraph 47. Ms. Freeman adds that the defendants alleged "failure to discover" resulted from the defendants failure to conduct a title search or failure to conduct such a search in a reasonable manner.

Ms. Freeman's negligence and wantonness contentions are confusing and incongruous in several respects. First, she has not named each defendant individually, or described what particular act of negligence was committed by each defendant or identified which transaction is associated with each act of negligence. In contrast, she combined all of the defendants into a group which she labeled as "the Defendants," and essentially alleged that all of those "Defendants" committed all of the described acts of negligence in connection with all three of the transactions. Consequently, neither the Court nor the defendants can accurately determine which defendant was supposed to have done what, and when, and how.

Additional similar allegations and facts make it impossible for the defendants to defend themselves. In regard to the October 6, 1997, transaction, there were no liens

---

[1]The Court is not criticizing how the complaint was drafted. Counsel for the plaintiff crafted the best complaint possible given the fact situation in which the complaint had to be drafted.

on the property when that transaction was consummated, and, therefore, no liens which could have been discovered by the "Defendants." As a matter of law, none of the defendants can be held liable in negligence for not discovering nonexistent liens. Consequently, the complaint states no cause of action for negligence against any of the defendants with respect to the alleged failure to discovery liens in connection with the October 6, 1997, transaction.

In addition, the City of Mountain Brook's certificate of judgment was not recorded until after the November 21, 2000, transaction. Consequently, that judgment could not possibly have been discovered by the "Defendants" as part of any title search that was or should have been conducted in connection with any of the three transactions. As a matter of law, none of the defendants can be held liable in negligence for failing to discovery a potential lien that did not come into being until after the required performance of their purported duty to conduct a title search.

In addition, the phrase "had been or might be recorded" in reference to what the "Defendants" were supposed to have discovered is misplaced. The phrase suggests that, had the "Defendants" searched the probate records, they could have discovered not only liens which, "had been... recorded against the property," but also could have discovered liens which "might be" but had not been, "recorded against the property." The "Defendants" were under no duty to discover what had not occurred.

Ms. Freeman's negligence and wantonness contention relating to the purported failure to discover that title to the property lay jointly in the names of Mr. Freeman and Ms. Freeman assumes for its validity that the "Defendants" did not know that the property was jointly titled in both names. That assumption is, however, untrue, since Ms. Freeman, according to the factual allegations contained in her complaint, specifically told the "Defendants" prior to October 6, 1997, the date that the first transaction was completed, that her ex-husband's name was on the property's title and gave them her divorce decree to prove it. That means of course, that the "Defendants," knew full well that title to the property was in both names. The First Amended Complaint reads, "The Plaintiff specifically told the Defendants' representatives that she wanted the title to the house out of her husband's name and solely in her own name." First Amended Complaint, page 4, paragraph 15. It continues, "The Defendants' representatives told the Plaintiff that she could expedite the process by going to the courthouse and obtaining copies of her divorce papers and then bringing them back. The Plaintiff did that." Id.

In fact, the "Defendants" concluded, based on the state court divorce decree, that title already lay in Ms. Freeman alone, and that consequently, a formal conveyance from Mr. Freeman would be unnecessary. Again that complaint reads:

> According to the title insurance policies issued by Defendants during this initial re-financing and subsequent re-financing by Ameriquest, the Defendants relied solely upon the order of the Domestic relations Court in

7

making the determination that Jennifer Freeman was the sole owner of
the subject property and that title was in her name.

First Amended Complaint, pages 4-5, paragraph 16.

Since the assumption upon which Ms. Freeman's negligence and wantonness
contention hinges for its validity is untrue, the contention is likewise false and states no
cause of action against the Defendants. In short, the "Defendants" cannot be
considered guilty of negligence in failing to "discover" that which they already knew,
since "to discover" is, by definition, to obtain knowledge or awareness of something
theretofore unknown.

Even more clear is that Ms. Freeman's complaint fails to state a negligence
cause of action against any of the "Defendants" for their failure to "discover," in
connection with the October 6, 1997, transaction, that title to the property lay jointly in
both Mr. and Ms. Freeman's names. Her theory is that the "Defendants" had a duty to
"discover" that the title to the property had not been transferred into her name alone as
she had requested. Of course, such a discovery would have been impossible in
connection with the October 6, 1997, closing, since any title search that was, or should
have been, conducted in anticipation of that closing would have been completed prior to
the closing, and therefore prior to the anticipated transfer from Mr. Freeman to Ms.
Freeman.

Anomalously, Ms. Freeman has not alleged in Count I that the "Defendants"
negligently or wantonly failed to take the steps necessary to have her husband's name
removed from the title to the property, which Ameriquest and Fidelity had, according to
her factual allegations, specifically promised to do. In the "Facts" section of her
complaint she emphasized, "Contrary to the representations made by the
representatives of the Defendant, the Defendants' representatives failed to take the
appropriate action to make sure that all the documentation that was necessary was filed
of record, including a deed from William Freeman to the Plaintiff." First Amended
Complaint, page 4, paragraph 16.

Even if Count I were to be construed to include by implication that unspoken
contention, it states no cause of action against either Title Source or First Title. Title
Source, according to Ms. Freeman's complaint, was not even involved in the first
transaction, which was when Ms. Freeman made her request to have property
transferred into her name alone, and was purportedly told that the property would be
transferred into her name alone. First Title's only role with respect to the first
transaction was to conduct a title search. The referenced complaint reads, "The title
search was to be performed by First Title." First Amended Complaint, page 6,
paragraph 18. And all of Ms. Freeman's conversations regarding titling the property in
her name alone were purportedly conducted with representatives of Ameriquest and the
"title insurance company," which according to other parts of her complaint, was
allegedly Fidelity. Count I, therefore, describes no breach of any duty on the part of

8

either Title Source or First Title to take the steps necessary to have Mr. Freeman's name removed from the property's title.

The circumstances described in Ms. Freeman's complaint reflect no duty on the part of Ameriquest to conduct a title search or discover liens in connection with any of the transactions, especially liens which might exist outside of its own chain of title. Ameriquest is described in the complaint as merely a mortgage company that loaned money to Ms. Freeman. The Court knows of no case law or statute that requires a mortgage lender to conduct or commission a title search for its borrower, or to discover liens for its borrower. See Pruitt v. Colonial Mortgage Co., 548 So.2d 1039, 1041 (Ala. 1989)(mortgagee breached no duty to mortgagors by not discovering several outstanding liens and judgments against property where agreement between parties only required mortgagee to finance purchase of property).

A mortgagee's obligation to loan money to a mortgagor does not equate with an obligation to perform a title search for the mortgagee. Consequently, Ms. Freeman's allegation that Ameriquest made a mortgage loan to her does not suggest or describe a duty on the latter's part to conduct a title search for the former.

Furthermore, according to the complaint, First Title had the duty to conduct the title search with respect to the first transaction. The complaint reads, "The title search was to be performed by First Title." First Amended Complaint, page 6, paragraph 18. The complaint also alleges that Fidelity or Title Source had the duty to conduct the title search with respect to the second and third transactions. The complaint also reads, "On November 16, 1998, Plaintiff again refinanced the current mortgage on the property with the Defendant Ameriquest.... The title search was to be performed by Defendants Title Source and/or Fidelity." First Amended Complaint, page 6, paragraph 22. It also reads, "On November 21, 2000, Plaintiff refinanced her mortgage again with Ameriquest.... The title search was to be performed by Title Source and/or Fidelity." First Amended Complaint, page 7, paragraph 25.

The circumstances described in Ms. Freeman's complaint reflect no duty on the part of either Fidelity or Title Source to discover the tax lien notice filed by the State of Alabama and the certificate of judgment filed by First Commercial Bank. The Court knows of no statute or other legal authority which imposes a duty on a title examiner to search outside of its purchaser's chain of title. According to the factual allegations contained in the complaint, Fidelity worked for Ameriquest, but not Ms. Freeman. And Title Source worked for Ameriquest or Fidelity, but not Ms. Freeman. Ameriquest and Fidelity were satisfied that Mr. Freeman had no interest in the property based on the divorce decree and that a formal conveyance from Mr. Freeman to Ms. Freeman was unnecessary to effect the result desired by Ms. Freeman.

Consequently, once Ms. Freeman transferred the property to Ameriquest on October 6, 1997, Fidelity or Title Source (which ever of the two conducted the title search) was obligated, from that point forward, to examine the indices in the probate

9

court only under the name of Ameriquest's grantor, which was Ms. Freeman. Such a search would not have turned up any certificate of judgment or notice of tax lien bearing only Mr. Freeman's name. Wallace v. Frontier Bank, N.A., 2004 WL 2914920, *7 (Ala., Dec. 17, 2004); Rolling "R" Construction, Inc. v. Dodd, 477 So.2d 330, 331-333 (Ala. 1985); Jefferson County v. Mosley, 284 Ala. 593, 226 So.2d 652 (1969).

Consequently, Count I states no claim upon which relief may be granted against either Fidelity or Title Source for failure to discover the State of Alabama's tax lien notice or First Commercial's certificate of judgment because they had no duty to discover those items.

Furthermore, the failure to discover the tax notice filed by the State of Alabama and certificate of judgment filed by First Commercial Bank could not have possibly resulted in any injury to Ms. Freeman in regard to the liens, if any, created by those documents being filed for record. Neither defendant had any hand in the recording of those documents. And whether or not those recorded documents were discovered by Fidelity or Title Source could not have prevented them from being recorded. In fact, the documents were recorded before Fidelity's and Title Source's alleged duty to discover them ever arose. Consequently, Fidelity and Title Source could not, by discovering those recorded documents later, have prevented those documents from being recorded, or prevented the creation of any liens which may have resulted from the recording of those documents, or alleviated in any respect the injury suffered by Ms. Freeman as a result of the creation of any such liens. The only compensable harm that could have been avoided by the discovery of those documents was the lien, if any, created by, or cloud on Ms. Freeman's title which arose from, Mountain Brook's subsequent recordation of its certificate of judgment. That is true because had Ms. Freeman been informed about the documents recorded by the state and First Commercial, she could have taken steps at that point in time to have Mr. Freeman's name removed from the title.

Count I, therefore, states no claim upon which relief may be granted against Fidelity or Title Source for failure to discover the State of Alabama's tax lien notice or First Commercial's certificate of judgment, to the extent Ms. Freeman seeks damages for any liens which may have arisen as a result of the recording of those documents in particular.

Ms. Freeman also claims in Count I that Ameriquest, Fidelity, First Title, and Title Source owed some sort of duty to her to conduct a title search because she paid for the title searches that were supposed to have been conducted with respect to each of the three transactions. The complaint reads, "Despite the fact that Plaintiff repeatedly paid for a proper title search to be performed and paid for qualified professionals to properly close the loan, no such title search was performed, or was not performed properly." First Amended Complaint, page 11, paragraph 47. That contention does not agree with the facts alleged in the complaint. The allegations in the "Facts" section of the complaint reflect that Ms. Freeman did not pay for the title searches that were

10

supposed to be conducted in connection with the first two transactions. That section reads, "On October 6,1997, Plaintiff first refinanced the loan on the property with Defendant, Ameriquest. At this time Plaintiff paid $587.00 for title insurance on the property and $100.00 in attorneys fees." First Amended Complaint, page 6, paragraph 18. That section includes, "On November 16, 1998, Plaintiff again refinanced the current mortgage on the property with the Defendant Ameriquest. At this point in time, Plaintiff paid once again $515.00 for title insurance and $75.00 for attorneys' fees related to procuring the title insurance." First Amended Complaint, page 6, paragraph 22.

Ms. Freeman's complaint includes the allegation that she is a "third-party beneficiary" of the respective obligations of First Title, Title Source, and Fidelity to perform title searches for Ameriquest. It is apparent, therefore, that Ms. Freeman's "payment for the title search," as she characterizes it, in connection with the November 21, 2000, transaction did not represent, and was not intended by her, as payment for having a title search performed for or on behalf of herself. Instead, it merely represented her reimbursement to Ameriquest of one of its costs of providing the loan to her, that is, Ameriquest's cost of obtaining a title search for its own use, as part of and prerequisite to making the loan to Ms. Freeman. Ms. Freeman's reimbursement of Ameriquest's title search fee created no duty on the part of either Ameriquest or those who were supposed to conduct the title search for Ameriquest to perform a title search for her also.

The definitive rule in Alabama on the liability of one who has contracted to conduct a title search in connection with a real estate transaction to ones other than he or she who commissioned the search is stated in Shine v. Nash Abstract & Investment Co., 217 Ala. 498, 117 So. 47 (1928). The opinion there reads:

> The weight of authority sustains the rule that one engaged in the business or calling of making abstracts of title to real estate for hire, under employment of a vendor, is not liable, because of negligence in the preparation of the abstract, to the vendee, in the absence of notice or knowledge that the abstract is to be furnished to, and used by, the vendee in consummating the sale of the property.
>
> ....
>
> But we are of opinion that sound reasoning and the weight of modern authority sustain the rule of liability for negligence resulting in injury to the vendee, where the vendor is under duty, or assumes the obligation, to furnish such abstract for the use of the vendee, and the person making the abstract on the vendor's order has knowledge or notice that the abstract is for such use, this on the ground that in such circumstances the engagement of the abstracter by the vendor is a contract made for the benefit of the vendee, and under such engagement

11

the abstracter owes the vendee, who is to use and rely on the abstract, the duty of using reasonable care and skill in examining the records affecting the title and making the abstract.

....

And it was not of consequence that the abstract of title is not delivered to the vendee directly, but is delivered to the vendor for his use, with knowledge or notice on the part of the abstracter that the vendee will use and rely on the abstract in consummating the sale. However, the abstracter of titles is not a guarantor, unless he expressly so undertakes, and, if liability exists, in the absence of express guaranty, it must be grounded on negligence.

The rule of liability arising from contract made for the benefit of a third person does not go to the extent of giving to a third party, whose interest in the contract is merely indirect or incidental, but only to those whose interest is direct, and out of which an immediate duty arises, though the benefit may be postponed to the happening of a definite contingency, and to sustain liability there must be "a debt or duty owing by the promisee to the" third "party claiming the right to sue."

117 So. at 48-49.

To summarize, the rule enunciated in <u>Shine</u> is this: a title abstracter who has been employed by a seller, is not liable, because of negligence in the preparation of the abstract, to the purchaser, absent notice or knowledge that the abstract is to be furnished to, and used by, the purchaser in consummating the sale of the property. Conversely, where the seller is under a duty, or assumes the obligation, to furnish such abstract for the use of the purchaser, and the person making the abstract on the seller's order has knowledge or notice that the abstract is for such use, the abstracter owes the purchaser the duty of using reasonable care and skill in examining the records affecting the title and making the abstract. This rule is based on the ground that in such circumstances the engagement of the abstracter by the seller is a contract made for the benefit of the purchaser.

The circumstances Ms. Freeman alleges with regard to the latter two transaction fall within the general rule proclaimed in <u>Shines</u>. That rule exempts title abstracters from liability to those other than the party who contracted for their services. According to her allegations, subsequent to October 6, 1997, Ms. Freeman did not know that the conveyance had been obtained from Mr. Freeman. Therefore, she could not possibly have told Fidelity or Title Source about the "title defect," as she has characterized it, that existed with respect to that problem when the latter two loans were closed.

12

Both Ameriquest and Fidelity assumed that no conveyance from Mr. Freeman was necessary.  Ms. Freeman did not know about any possible liens or clouds on the title resulting from actions taken by Mr. Freeman's creditors.  To the contrary, Ms. Freeman specifically alleged that she did not know about any of those possible liens or clouds.  She, therefore, could not have provided any information regarding the same to Fidelity or Title Source.  Her complaint does not contain any allegation or suggestion that either Fidelity or Title Source were told about any possible clouds on the title resulting from actions taken by Mr. Freeman's creditors. She was not furnished, and did not use, any title abstract in consummating any of the transactions with Ameriquest.  In fact, she claims that no title searches were conducted, and that no title abstracts were prepared, in connection with any of those transactions.  And, although the title searches that Fidelity and Title Source were supposed to have performed, and the title abstracts that they were supposed to have prepared, in connection with those transactions were for a "purchaser," the things which Ms. Freeman has suggested they would have discovered as a result of those searches, i.e., the documents recorded against Mr. Freeman, were not in the "purchaser's" chain of title.

Those circumstance plainly reflect that Ms. Freeman was not furnished, and did not use any title searches performed or title abstracts prepared by Fidelity and Title Source.  Fidelity and Title Source did not have any notice or knowledge that any title abstract prepared by them would be furnished to or used by Ms. Freeman in connection with the two transactions.  Under those circumstances, Fidelity and Title Source cannot, by virtue of Shine, be held liable in damages to Ms. Freeman for failing to search for or discover anything in connection with the latter two transaction.  Count I, therefore, plainly fails to state a claim for negligence or wantonness upon which relief may be granted against either Fidelity or Title Source in failing to search for or discover anything in connection with the transactions that occurred on November 16, 1998, and November 21, 2000.

In contrast, Ms. Freeman argues that the circumstances she alleges except her from the operation of the general rule of nonliability enunciated in Shine.  In support of that contention, she cites Steadman v. Central Alabama Title Co., 812 So.2d 290 (Ala. 2001) and Fox v. Title Guaranty and Abstract Co. of Mobile, Inc., 337 So.2d 1300 (Ala. 1976).

In Steadman v. Central Alabama Title Co., 812 So.2d 290 (Ala. 2001), the plaintiffs contacted a mortgage broker about refinancing their home.  They explained to the broker that they wanted to refinance their home so that they could pay the IRS tax liens on their property, but they did not know the amount owed.  The broker retained the owner of a title company to do a title search on the property to determine the amount of the IRS liens.  The plaintiffs paid for the title search, but did not speak with anyone from the title company until the loan closing.  The title company was also hired by the mortgage lender to perform the loan closing.

Case 04-00002-BGC    Doc 42    Filed 03/23/05    Entered 03/23/05 12:56:33    Desc Main
Document      Page 13 of 82

The owner of the title company discovered only one IRS lien on the property and concluded that $2,373.01 was owed on the lien. The owner of the title company was also a general agent for a title insurance company, which issued a title commitment that showed the one IRS lien.

The property was actually encumbered by another IRS lien, in the amount of $5,763.58, which had not been discovered by the title company. The plaintiffs and the owner of the title company attended the loan closing. The plaintiffs told the owner of the title company that they thought they owed more on the IRS lien than the amount represented on the settlement statement. But the owner of the title company reassured the plaintiffs that he had located only the one IRS lien, in the amount of $2,373.01, so the plaintiffs closed on the loan and paid the title insurance premium. The title company held $2,900.00 for payment of the $2,373.01 IRS lien. Subsequently, the IRS notified the plaintiff that it held several liens on the property and that their payoff on the was $8,339.41.

The plaintiffs sued the title company and its owner alleging, among other things, that the defendants had breached their contract to perform a complete title search. The trial court granted summary judgment in favor of the defendants. On appeal, the Alabama Supreme Court found that summary judgment was improvidently granted because there existed a genuine issue of material fact as to whether there was a contract between the plaintiffs and the defendants, and whether the defendants breached that contract by failing to discover all the tax liens encumbering the property. Its opinion explained:

> The evidence presented by the... [plaintiffs] indicates that they hired... [the mortgage broker] to procure the loan so that they could pay off the tax liens that encumbered their property. Therefore,... [the mortgage broker] hired... [the owner of the title company] to conduct a title search on the... [plaintiffs] property, and the... [plaintiffs] paid the costs of that search. We conclude that this evidence is sufficient to create a genuine issue of material fact as to whether a valid contract existed between the... [plaintiffs], on the one hand, and... [the owner of the title company] and... [the title company], on the other.

812 So.2d at 294 (parentheticals added)

The court also concluded that summary judgment was improvidently granted because there existed a genuine issue of material fact as to whether the plaintiffs were third-party beneficiaries of the contract between the defendants and the mortgage broker. The court's opinion reads:

> The evidence presented by the Steadmans indicates that they hired Walden to procure the loan so that they could pay off the tax liens that encumbered their property, and that Walden contracted with Parker

14

for Parker to conduct a title search on the Steadmans' property.  Parker apparently knew that the purpose of the title search was to determine the amount of the IRS tax liens encumbering the Steadmans' property and, thus, to determine the amount of the loan needed to refinance the property.   We conclude that this evidence is sufficient to create a genuine issue of material fact as to whether the Steadmans are third-party beneficiaries of the contract between the defendants and Walden.

812 So.2d at 295 (emphasis added).

In Steadman, the prospective mortgagors contacted the prospective mortgagee to deal with a specific problem, that is an existing lien on their land.  And they told the prospective mortgagee about the problem.  The prospective mortgagee, in turn, engaged a title abstracter to determine the extent of the lien and, for that purpose, told the title abstracter about the lien.  The mortgagees were provided the information obtained by the title abstracter as a result of his title search.  They made the decision to accept the loan from the mortgagor and made the decision regarding how much of the loan would go to satisfy the outstanding lien.  They were injured because the title abstracter failed to discover what appeared of record in the mortgagee's chain of title.  Under those circumstances, the court determined that the mortgagor could be a third-party beneficiary of the mortgagor's contract with the title abstracter and that the title abstracter could fall outside of the general rule of nonliability to third-parties enunciated in Shine.

But those circumstances are not similar to the circumstances described in Ms. Freeman's complaint.  Ms. Freeman did not contact Ameriquest, with respect to the second and third transactions, to deal with a specific problem with, or encumbrance on, her property.  She did not know, according to her allegations, that no conveyance had been obtained from Mr. Freeman.  And both Ameriquest and Fidelity assumed that no conveyance from Mr. Freeman was necessary.  Ms. Freeman did not know about the documents which had been filed for record by Mr. Freeman's creditors and those documents were not in Ameriquest's chain of title.  So she could not have told Fidelity and Title Source about any of those special problems and could not have been seeking either of the loans for the purpose of dealing with any of those unknown problems.

Ameriquest, therefore, could not have in turn told Fidelity and Title Source about those problems or engaged them to determine the extent of those problems.  Ms. Freeman was not provided with the results of any title searches performed by Fidelity and Title Source and in fact contends that none were conducted.  She, therefore, did not rely, and could not have relied, in any respect on the results of any title searches performed by Fidelity and Title Source, and was not, therefore, injured by any information contained in, or missing from, in any such title abstracts.  And the disposition of the latter two loans made to Ms. Freeman by Ameriquest was not based in whole or in part on any title searches performed of title abstracts prepared by Fidelity or Title Source.

Steadman is in accord with the tenants expressed in Shine. The title abstracter in Steadman was alleged to have known or had notice that the abstract would be provided to and used by the mortgagors in connection with their transaction with the mortgagee. The abstract was alleged to have been provided to and used by the mortgagors in connection with their transaction with the mortgagee.

In the present case, Ms. Freeman has not alleged that Fidelity or Title Source knew or had notice that any abstract prepared by them would be provided to and used by her, or that any abstract prepared by them was actually provided to and used by her either in connection with her transactions with Ameriquest or otherwise. To the contrary, her allegations refute the possibility of any such allegations. She has alleged that she did not know about the things that Fidelity and Title Source were supposed to have discovered, and that no title searches were conducted, or abstracts prepared, in connection with any of the transactions.

The circumstances alleged by Ms. Freeman, therefore, do not meet the criteria of either Shine or Steadman for imposing liability to her on Fidelity and Title Source for title searches and abstracts which they were purportedly supposed to have conducted and prepared pursuant to their contract with Ameriquest.

In Fox v. Title Guaranty and Abstract Co. of Mobile, Inc., 337 So.2d 1300 (Ala. 1976), the other case relied on by Ms. Freeman, the mortgagors contacted a mortgage company relative to refinancing their home. They informed the loan officer that the IRS had possibly placed a lien on the house and told him that they wanted to use the money from the loan to pay off the IRS lien and to otherwise consolidate some bills. The loan officer informed the mortgagors that the mortgage company had a title company that they worked with all the time and, if there was any lien whatsoever, they would find it. Thereafter, according to the mortgagors, the loan officer assured them that the title company had cleared the property and there was no lien on it. The loan was closed and a new mortgage was executed to the mortgage company. In connection with the loan closing, the mortgage company took out a mortgage title insurance policy.

The mortgagors used the money which they received from the mortgage loan to pay off debts other than the one that they owed to the IRS, believing that there was no IRS lien. Subsequently, the IRS, which indeed had a lien that had not been discovered by the title company, sold the property to satisfy the lien. The title insurance company purchased the property at the tax sale for $8,006.89, then sued the mortgagors for ejectment and rent. The mortgagors defended on the grounds of estoppel and unjust enrichment and counterclaimed for negligence, fraud, and breach of contract as the purported third party beneficiary of the title insurance policy. The trial court granted summary judgment for the title insurance company. On appeal, the Alabama Supreme Court determined that summary judgment was improvident and reversed, on the grounds that the title insurance would profit from its own negligence if it were allowed to oust the plaintiffs. The court's opinion reads:

16

If the summary judgment is upheld, the result would be that Title Guaranty would have (1) the premium for the policy paid by the Foxes, (2) the Foxes home, worth at least $28,480.00, for which Title Guaranty had only paid approximately $8,000.00; and (3) Title Guaranty would have no obligation under the insurance policy so long as the Foxes continued to make mortgage payments for which they are personally liable. The Foxes argue that to allow Title Guaranty to prevail is unjust enrichment and would permit a party to profit from its own wrong.

337 So.2d at 1304.

The court in <u>Fox</u> elucidated no further reason for its decision and did not intimate how it might rule on the mortgagors' counterclaims. The opinion reads, "At this stage of the proceeding, we have not addressed ourselves to each defense, counter-claim, etc. We are clear to the conclusion, however, that the summary judgments were prematurely granted." <u>Id</u>. at 1305.

The circumstances related in <u>Fox</u> are similar to those involved in <u>Steadman</u>, and saliently dissimilar to the circumstances described in Ms. Freeman's complaint. The court in <u>Fox</u> did not opine or speculate as to whether or not the circumstances involved therein might or might not constitute an exception to the general rule of nonliability enunciated in <u>Shine</u>. Furthermore, the circumstances alleged by Ms. Freeman do not purport to involve either a purchase of her property by either Fidelity or Title Source or an attempt by either of those defendants to oust her from her property. Consequently, <u>Fox</u> is no authority for the validity of the negligence or wantonness claims expressed by Ms. Freeman against either Fidelity or Title Source in <u>Count I</u> of her complaint.

### 2. Ms. Freeman's negligence and wantonness claims are barred by the applicable statute of limitations.

Regardless of the construction accorded Ms. Freeman complaint, it fails to state a claim for negligence or wantonness against any of the defendants upon which relief may be granted because her right to bring a cause of action based on negligence or wantonness is barred by the applicable statute of limitations.

Dismissal of a complaint pursuant to Fed.R.Civ.P. 12(b)(6), to the extent it is based on a particular cause of action, is appropriate where the allegations contained in the complaint, on their face, clearly describe the existence of an affirmative defense which precludes the plaintiff's ability to recover on that cause of action. The court in <u>Marsh v. Butler County, Alabama</u>, 268 F.3d 1014 (11th Cir. 2001), recognized, "A complaint is also subject to dismissal under Rule 12(b)(6) when its allegations – on their face – show that an affirmative defense bars recovery on the claim." <u>Id</u>. at 1022. The explanation by the court in <u>Quiller v. Barclays American/Credit, Inc.</u>, 727 F.2d 1067 (11th Cir. 1984), <u>cert. denied</u>, 476 U.S. 1124 (1986) is helpful. The court's opinion reads:

17

Generally, the existence of an affirmative defense will not support a motion to dismiss. Nevertheless, a complaint may be dismissed under Rule 12(b)(6) when its own allegations indicate the existence of an affirmative defense, so long as the defense clearly appears on the face of the complaint.  See, e.g., Concordia v. Bendekovic, 693 F.2d 1073 (11th Cir. 1982)(party may raise affirmative defense of res judicata by 12(b)(6) motion when defense's existence may be judged on face of complaint); Mann v. Adams Realty Co., 556 F.2d 288, 293 n. 6 (5th Cir. 1977) (defense of statute of limitations may appear on face of complaint); see generally 5 C. Wright & A. Miller, Federal Practice and Procedure § 1357 (1969).  The claim may be adequately stated, as it is here, but in addition to the claim the complaint may include matters of avoidance that preclude the pleader's ability to recover.  When this occurs, the complaint has a built-in defense and is essentially self-defeating.  "[T]he problem is not that plaintiff merely has anticipated and tried to negate a defense he believes his opponent will attempt to use against him; rather plaintiff's own allegations show that the defense exists."  Id.

727 F.2d at 1069.

Consequently, dismissal is warranted where the allegations of a plaintiff's complaint clearly reflect that his or her claim is time barred.  The court in La Grasta v. First Union Securities, Inc., 358 F.3d 840 (11th Cir. 2004) wrote, "[A] Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate only if it is 'apparent from the face of the complaint' that the claim is time-barred." Id. at 845 (quoting Omar v. Lindsey, 334 F.3d 1246, 1251 (11th Cir.2003)).  The court in Jone v. ALCOA, Inc., 339 F.3d 359 (5th Cir. 2003), cert. denied, 540 U.S. 1161 (2004), stated, "A statute of limitations may support dismissal under Rule 12(b)(6) where it is evident from the plaintiff's pleadings that the action is barred and the pleadings fail to raise some basis for tolling or the like." Id. at 366.

The same principal holds true under Alabama law.  That law is, "'the standard for granting a motion to dismiss based upon the expiration of the statute of limitations is whether the existence of the affirmative defense appears clearly on the face of the pleading.'"  Jones v. ALFA Mutual Insurance Co., 875 So.2d 1189, 1193 (Ala. 2003) (quoting Braggs v. Jim Skinner Ford, Inc., 396 So.2d 1055, 1058 (Ala. 1981).

Under Code of Ala., 1975, § 6-2-38(l), a plaintiff is required to commence a negligence or wantonness cause of action within two years from the date it accrued.  Gilmore v. M. & B. Realty Company, 2004 WL 1475424, *5 (Ala., July 2, 2004);

18

<u>Sanders v. Peoples Bank & Trust Co.</u>, 817 So.2d 683, 686 (Ala. 2001); <u>Henson v. Celtic Life Insurance Co.</u>, 621 So.2d 1268, 1274 (Ala. 1993).[2]

Such a cause of action accrues when the plaintiff can first maintain the action, which is when the first injury occurred, "regardless of whether the full amount of damage is apparent at the time of the <u>first injury</u>." <u>Booker v. United American Ins. Co.</u>, 700 So.2d 1333, 1339 (Ala. 1997).[3]

For example, in <u>Gilmore v. M. & B. Realty Company</u>, 2004 WL 1475424 (Ala., July 2, 2004), the plaintiffs were shown a home at a particular address by a real estate agent. After viewing the home, the plaintiffs placed an offer on it. The offer was accepted. Because of her confusion regarding the address where the house was located, the agent, as it later turned out, had actually shown the plaintiffs a different house than the one owned by the seller, which was located across the street from the house that she had shown them. At closing, the plaintiffs received a deed containing a legal description of the house owned by the seller which, of course, was not the one that they thought that they were buying. The plaintiffs moved into the house which they had been shown by the agent. Five years later, the true owner of the home knocked on their door, informed him that he owned the property, and asked them to leave. They did.

After investigation, the plaintiffs discovered that the legal description contained in their deed described the property located across the street from where they had been residing. They evicted the persons living in the house which they had actually purchased, but the house was in such a distressed condition that they could not occupy it. Within two years after they were informed by the property's true owner that they did not in fact own the house which they had been shown by the real estate agent, and had

_____

[2]Wantonness of the nature described by Ms. Freeman in her <u>Count I</u>, i.e., actions which do not involve the intentional application of force to another's person or property, is referred to in Alabama jurisprudence as "trespass on the case." <u>McKenzie v. Killian</u>, 887 So.2d 861, 869-870 (Ala. 2004). The statute of limitations for actions grounded in "trespass on the case" is the same as for negligence actions. "We can say with comfort ... that the statutory period of limitations for an action in trespass on the case is two years." <u>Id</u>. at 866.

[3]See also " <u>Mississippi Valley Title Ins. Co. v. Hooper</u>, 707 So.2d 209, 213 (Ala. 1997) ("The limitations period begins to run when the plaintiff first suffers 'legal injury,' not when the plaintiff may later pay damages or suffer some compounding of the original injury.); <u>Becton v. Rhone-Poulenc, Inc.</u>, 706 So.2d 1134, 1135-36 (Ala. 1997) ("A plaintiff's ignorance of the fact of injury, if there is no fraudulent concealment by the defendant, does not postpone the running of the limitations period."); <u>Henson v. Celtic Life Insurance Co.</u>, 621 So.2d at 1274 ( "There is no 'discovery rule' to toll the running of the limitations period with respect to negligence or wantonness actions ...."); and <u>Mississippi Valley Title Ins. Co. v. Hooper</u>, 707 So.2d at 213 ("Even if the plaintiff is ignorant of the injury at the time (except in fraud cases), the limitations period begins to run.")

resided in for five years, the plaintiffs filed suit against the selling real estate agents and the property-management brokers, claiming negligence, wantonness, and fraudulent misrepresentation.

Regarding the negligence and wantonness claims, the plaintiffs contended that the two year statute of limitations did not begin to run until the property's real owner informed them that they were living in the wrong house. The trial court disagreed, concluding that the limitations period began to run when the plaintiffs first suffered a legal injury, which was on the day that the sale closed, even though they did not, on that occasion, know that they had been injured. On appeal, the Alabama Supreme Court affirmed the judgment entered by the trial court in favor of the defendants on the plaintiffs' negligence and wantonness claims, rejecting the plaintiffs' argument that they were first injured when they were informed that they did not own the property. The court's opinion reads:

> The Gilmores concede that § 6-2-38(l), Ala. Code 1975, prescribes a two-year statute of limitations for their negligence and wantonness claims, measured from the date of injury. They attempt to avoid the bar of the expiration of that limitations period by arguing that they experienced no injury at the time of the closing of the transaction on November 24, 1993, but rather that "the injury occurred when the true owner of the house first appeared at the [Gilmores'] doorstep in 1999." (Gilmores' brief, at 11.) In that regard, the Gilmores misperceive the law.
>
> As this Court recently explained in Chandiwala v. Pate Construction Co., 889 So.2d 540, 543 (Ala. 2004):
>
> > "The statute of limitations on a claim begins to run when the cause of action accrues. Home Ins. Co. v. Stuart-McCorkle, Inc., 291 Ala. 601, 285 So.2d 468 (1973). A cause of action accrues as soon as the claimant is entitled to maintain an action, regardless of whether the full amount of the damage is apparent at the time of the first legal injury. Smith v. Medtronic, Inc., [607 So.2d 156 (Ala. 1992)]; Garrett v. Raytheon Co., 368 So.2d 516, 518-19 (Ala. 1979). In Kelly v. Shropshire, 199 Ala. 602, 604-05, 75 So. 291, 292 (1917), the rule was stated as follows:
>> >
>> > > " ' "If the act of which the injury is the natural sequence is of itself a legal injury to plaintiff, a completed wrong, the cause of action accrues and the statute begins to run from the time the act is committed, be the actual damage [then apparent] however slight, and the statute will operate to bar a recovery not only for the present damages but for damages developing subsequently and not actionable at the time of the wrong done; for in such a case the subsequent increase in the damages resulting gives no new cause of action. Nor

20

does plaintiff's ignorance of the tort or injury, at least if there is no fraudulent concealment by defendant, postpone the running of the statute until the tort or injury is discovered." ' "

As we likewise explained in <u>Koch v. State Farm Fire & Casualty Co.</u>, 565 So.2d 226, 231 (Ala. 1990): "A negligence cause of action accrues as soon as the claimant is entitled to maintain an action, regardless of whether the full amount of damages is apparent at the time of the first legal injury." See also <u>Booker v. United American Ins. Co.</u>, 700 So.2d 1333, 1339-40 (Ala. 1997); and <u>Henson v. Celtic Life Ins. Co.</u>, 621 So.2d 1268, 1271-74 (Ala. 1993).

Had the Gilmores learned the true nature of the property mix-up immediately after the transaction had closed and they began occupying the premises, they could have begun prosecution then of the same negligence and wantonness claims they asserted in August 2000. Their negligence and wantonness claims accrued in November 1993 and were time-barred when they filed their action in August 2000.

2004 WL 1475424 at *5-6.

<u>Mississippi Valley Title Ins. Co. v. Hooper</u>, 707 So.2d 209, 213 (Ala. 1997) involved a suit brought by a title insurance company against an attorney who had, on 38 separate occasions, issued erroneous title certifications and, based upon those certifications, wrote, on the company's behalf and as its agent, title insurance policies. As a result, the company was required to indemnify the respective holders of those policies. In turn, the company, in 1994, sued the attorney for negligence and wantonness. The last policy was written by the attorney in February 1988. The company was first required to indemnify one of its insureds sometime in 1990, within the four year period which immediately preceded the date upon which it filed suit. The attorney moved to dismiss the company's suit on the grounds that the applicable four year statute of limitations had run prior to the suit being filed. The trial court agreed and dismissed the suit. In affirming the trial court's decision, the Alabama Supreme Court concluded that, with respect to each individual policy written by the attorney, the company suffered its first legal injury when the policy was written, not when the company was later required to pay indemnity based on the policy. The court's opinion reads:

Mississippi Valley argues that the trial court erred in dismissing the complaint because, it says, there was not sufficient information on the face of the complaint, or in the amendment, from which the trial court could have reasonably--and inescapably--concluded that the statute of limitations barred the claims. Mississippi Valley bases its argument on the assumption that on the date Hooper completed his work there had been no damage. Mississippi Valley contends that it incurred damage

21

only when it began to incur costs, i.e., when it had to start paying claims made under its policies; Mississippi Valley apparently insists that, because the complaint did not allege the date on which Mississippi Valley first incurred costs, the trial court could not have reasonably concluded, based on the pleadings before the court, that the limitations period had run. However, the major premise of that syllogism is flawed. We reject the argument that Mississippi Valley incurred legal injury only when it had to pay claims made under its policies.

707 So.2d at 213-214.

In <u>Booker v. United American Ins. Co.</u>, 700 So.2d 1333 (Ala. 1997), the plaintiff insured purchased a hospital insurance policy based on the erroneous representation that the policy was a major medical insurance policy. Two years later, the plaintiff was hospitalized which resulted in $49,000 in medical bills. The hospitalization policy covered only $14,000 of those bills, which, of course, led the plaintiff to discover that the policy was not a major medical policy as he had been told. Four months after that discovery, the plaintiff filed suit against the health insurer and its agent. The suit stated causes of action for negligence, wantonness, and fraud. The trial court entered summary judgment against the plaintiff on the negligence and wantonness claims on the grounds that they were barred by the applicable two year statute of limitations. The Alabama Supreme Court affirmed, concluding that the plaintiff first suffered legal injury when he signed the insurance application and wrote a check for the first premium. The first legal injury was not when he later incurred monetary damages because of the discrepancy between what his policy actually paid and what it would have paid had it been a major medical policy. The court's opinion reads:

It is well settled that a negligence cause of action accrues when the plaintiff can first maintain the action, regardless of whether the full amount of damage is apparent at the time of the first injury. <u>Henson v. Celtic Life Insurance Co.</u>, 621 So.2d 1268, 1271, 1274 (Ala. 1993). In <u>Henson</u>, 621 So.2d at 1271, 1274, this Court held that the plaintiff's completion of an application for a health insurance policy started the running of the two-year limitations period for a negligence action. Further, in <u>Henson</u>, 621 So.2d at 1273, this Court commented that an action for inducing a plaintiff to give up an old insurance policy in favor of a new policy accrued when the plaintiff gave up the old policy. In this case, as in <u>Henson</u>, 621 So.2d at 1274, the Bookers admit that any negligence or wantonness on the part of Stone or United American occurred, at the latest, in May 1991, when the Bookers signed the application and wrote the check for the policy. Thus, their claims accrued in May 1991. Because the Bookers filed their complaint in August 1993--over two years after their claims accrued--their negligence and wantonness claims are time-barred.

700 So.2d at 1339-40.

In this case, Ms. Freeman makes clear in her complaint that she paid for one of the title searches conducted and all of the title insurance policies issued in connection which each of the three transactions. She adds that even though she was not named as beneficiary in any of the latter, those payments gave rise, in part, to the duties which she contends that the "Defendants" have negligently breached. In that regard, her first injury with respect to each of those transactions occurred, therefore, on the date that the transaction closed.

Ms. Freeman filed her Chapter 13 case on January 23, 2003, over four years after October 6, 1997, when she first suffered a legal injury from the negligence or wantonness allegedly perpetrated by the "Defendants" in connection with the transaction that closed on that date. It was also over two years after November 16, 1998, and November 21, 2000, respectively, when she suffered legal injuries from the negligence or wantonness allegedly perpetrated by the "Defendants" in connection with the transactions that closed on those dates.

Based on the facts, it is apparent, therefore, from the face of Ms. Freeman's complaint, that the two year time period within which she was required to bring actions based on the allegedly negligent or wanton acts of the "Defendants" in connection with these transactions expired prior to the date that she filed her bankruptcy case. They therefore expired prior to the commencement of the present adversary proceeding on January 6, 2004.

Assuming for argument that Ms. Freeman did not suffer her first legal injuries on the dates that her transactions with Ameriquest were closed, she claims in her complaint that she suffered legal injuries when the State of Alabama filed its tax lien notice, when First Commercial filed its certificate of judgment, and when Mountain Brook filed its certificate of judgment. She claims that she was injured as a result of any negligent or wanton acts allegedly perpetrated by the "Defendants" with respect to the October 6, 1997, transaction on May 6, 1998, the date the State of Alabama recorded its tax lien notice for $5,112.67 in taxes owed by Mr. Freeman. According to Ms. Freeman's allegations, the tax lien notice, from the moment it was recorded, created a lien on her property.

In the very least, the tax lien notice imbued a cloud on Ms. Freeman's title and rendered the property virtually unmarketable until that cloud could be removed. See Hosey v. Central Bank of Birmingham, 528 So.2d 843, 845 (Ala. 1988). The fact that Ms. Freeman may not have found out about the tax lien notice until a few days prior to November 27, 2002, and did not lose a sale of the property until then, is of no import. "The full measure of damages that might ultimately result from the defendants' wrongful acts may not have been immediately foreseeable, but complainant's cause of action accrued when the instruments were filed for public record, and the statute of limitations began to run at that time." Id. at 844 (quoting Walley v. Hunt, 212 Miss. 294, 309, 54 So.2d 393, 398 (1951).

Likewise, with respect to the transactions closed on November 16, 1998, and November 21, 2000, Ms. Freeman claims that she was injured by negligence or wantonness allegedly perpetrated in connection with those transactions on December 14, 2000, when the City of Mountain Brook recorded its $17,123.00 certificate of judgment.  She claims that the recorded certificate of judgment, from the moment it was recorded, created a lien on her property.  Again, in the very least, the tax lien notice imbued a cloud on Ms. Freeman's title and rendered the property virtually unmarketable until that cloud could be removed.  Hosey v. Central Bank of Birmingham, 528 So.2d 843, 845 (Ala. 1988).  The fact that Ms. Freeman may not have found out about Mountain Brook's recorded certificate of judgment until a few days prior to November 27, 2002, and did not lose a sale of the property until then, is of no import.  Again, "The full measure of damages that might ultimately result from the defendants' wrongful acts may not have been immediately foreseeable, but complainant's cause of action accrued when the instruments were filed for public record, and the statute of limitations began to run at that time." Id. at 844 (quoting Walley v. Hunt, 212 Miss. 294, 309, 54 So.2d 393, 398 (1951).

In Hosey v. Central Bank of Birmingham, 528 So.2d 843 (Ala. 1988), the defendant bank obtained a judgment against the plaintiffs' son, and, in an effort to collect it, instituted proceedings which accidentally resulted in a sheriff's sale of certain real property owned by the plaintiff.  The bank purchased the property at the sheriff's sale.  A sheriff's deed was executed and filed for record with the applicable county probate office on May 14, 1982.  The plaintiff subsequently informed the bank that his son had no interest in the property and demanded that it take the proper steps to have the cloud on his title caused by the recording of the sheriff's deed removed, which the bank failed to do.  Consequently, the plaintiff filed suit against the bank for slander of title on January 22, 1986, three years and eight months after the recording of the sheriff's deed.  The bank argued that the two year statute of limitations applicable to such actions ran on May 14, 1984, two years after the sheriff's deed was recorded. The trial court agreed and entered summary judgment against the plaintiff.  The Alabama Supreme Court affirmed, concluding that the plaintiff was first injured on the date that the sheriff's deed was recorded, which triggered the running of the statute of limitations.  The court's opinion reads:

> We agree that the full measure of damages was unknown to the Hoseys on May 14, 1982, when the deed was recorded.  However, there was a cloud created on their title, which they claim lowered the value of their property and rendered it unmarketable.  This situation is not changed by the fact that no specific sale of the property was lost.

528 So.2d at 845 (emphasis added).

In Bressler v. Dudley, 694 So.2d 1355 (Ala. Civ. App. 1996), the defendant, on March 16, 1990, recorded a vendor's lien against real property owned by the plaintiff. As a consequence, the plaintiff filed a lawsuit against the defendant on November 12,

1992, alleging, among other things, slander of title. Based on <u>Hosey</u>, the trial court concluded that the plaintiff's cause of action for slander of title accrued on the date that the vendor's lien was filed for record. That court rendered a judgment against the plaintiff on that claim on the grounds that it had not been asserted prior to the expiration of the applicable two year statute of limitations. <u>Bressler v. Dudley</u>, 694 So.2d at 1357. The Alabama Court of Civil Appeals agreed and affirmed the judgment of the trial court.

<u>Hosey</u> and <u>Bressler</u> are not distinguishable from the present case on the basis that the causes of action involved in those cases are different than the cause of action involved herein. The same precept is applicable to actions sounding in negligence and wantonness as is applicable to actions for slander of title. The statute of limitations begins to run on the date of the first legal injury. The ruling in <u>Hosey</u>, later followed in <u>Bressler</u>, therefore is germane to the question of when a legal injury first occurs in situations where an encumbrance or other purported conveyance is recorded, regardless of what kind of cause of action is eventually initiated by a plaintiff whose property interest or title may have been adversely effected by that recordation.

In fact, unless a specific statute mandates otherwise, the precept that a statute of limitations begins to run on the date of the first legal injury applies to virtually all causes of action based on a breach of duty. That, of course, includes Ms. Freeman's negligence and wantonness claims. The opinion in <u>Mississippi Valley</u> reads:

> Generally, the statutory limitations period applicable to a claim based on a breach of duty runs from the date the plaintiff is first entitled to maintain an action based on the breach of duty, regardless of whether the full amount of damage is apparent on that date. <u>Home Ins. Co. v. Stuart-McCorkle, Inc.</u>, 291 Ala. 601, 285 So.2d 468 (1973). The limitations period begins to run when the plaintiff first suffers "legal injury," not when the plaintiff may later pay damages or suffer some compounding of the original injury. <u>Michael v. Beasley</u>, 583 So.2d 245 (Ala. 1991). In a breach of contract action, for example, the limitations period runs from the time the contract is broken, although substantial damage or loss from the breach is not sustained until afterward. <u>Stephens v. Creel</u>, 429 So.2d 278 (Ala. 1983). Even if the plaintiff is ignorant of the injury at the time (except in fraud cases), the limitations period begins to run. <u>Garrett v. Raytheon Co.</u>, 368 So.2d 516 (Ala. 1979). This Court has specifically distinguished between the word "damage," which means "loss, injury or deterioration," and the word "damages," which means "a compensation in money for a loss." <u>Boswell v. Liberty National Life Insurance Co.</u>, 643 So.2d 580 (Ala. 1994). The statute runs from the date of first "damage," not when "damages" are later paid.

<u>Mississippi Valley Title Ins. Co. v. Hooper</u>, 707 So.2d 209, 213 (Ala. 1997).

Ms. Freeman filed her Chapter 13 case on January 23, 2003. That is over four

25

years after May 6, 1998, when she suffered a legal injury from the negligence or wantonness allegedly perpetrated by the "Defendants" in connection with the transaction that closed on October 6, 1997, and over two years after December 14, 2000, when she suffered a legal injury from the negligence or wantonness allegedly perpetrated by the "Defendants" in connection with the transactions that closed on November 16, 1998, and November 21, 2000. It is apparent from the face of Ms. Freeman's complaint that the two year time period within which she was required to bring actions based on said negligent or wanton acts allegedly perpetrated by said "Defendants" in connection with said transactions expired prior to the date that she filed her bankruptcy case. Therefore, it expired prior to the commencement of the present adversary proceeding on January 6, 2004. Consequently, Ms. Freeman is precluded from recovering any damages against the Defendants for said negligent or wanton acts.[4]

---

[4]Section 108(a) of the Bankruptcy Code would not have operated to extend the applicable statute of limitations even if the same had not run until after Ms. Freeman filed her bankruptcy case. That statute provides:

> If applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or (2) two years after the order for relief.

11 U.S.C. § 108(a)(emphasis added).

By its plain language, section 108(a) applies only to "trustees" and its operation is limited to actions commenced by a "trustee" and has no application to actions commenced by a bankruptcy debtor. See generally United States v. C.I.T. Construction Inc. of Texas, 944 F.2d 253, 259-260 (5th Cir. 1991); Cunningham v. Healthco, Inc., 824 F.2d 1448, 1460 (5th Cir. 1987); Motor Carrier Audit and Collection Co. v. Lighting Products, Inc., 113 B.R. 424, 426 (N.D. Ill. 1989); Natco Industries, Inc. v. Federal Ins. Co., 69 B.R. 418, 419-420 (S.D.N.Y. 1987); Burroughs v. Local Acceptance Co. (In re Dickson), 432 F. Supp. 752, 756 (W.D.N.C. 1977); Wepsic v. Josephson (In re Wepsic), 231 B.R. 768, 777 (Bankr. S.D. Cal. 1998); Lawler v. Republic Bank Dallas (In re Lawler), 53 B.R. 166, 172 (Bankr. N.D. Tex. 1985); Tingley v. Harrison, 867 P.2d 960, 965 (Idaho 1994); Engine Rebuilders v. Seven Seas Import-Export & Merc., 615 P.2d 871, 874 (Mont. 1980); Besing v. Seeligson, Douglass, Falconer, & Van Eykel, 822 S.W.2d 107, 109 (Tex. Ct. App. 1991).

"Where a statute... names the parties granted [the] right to invoke its provisions, ... such parties only may act." Hartford Underwiters Ins. Co. v. Union Planters Bank, 530 U.S. 1, 7 (2000). "[A] situation in which a statute authorizes specific action and designates a particular party empowered to take it is surely among the least appropriate in which to presume nonexclusivity." Id. at 6. The subject in Hartford was the proper interpretation of 11 U.S.C.

Consequently, Ms. Freeman does not possess any claims for negligence and wantonness upon which relief may be granted against any of the defendants named in her complaint. Those claims are therefore due to be dismissed pursuant to Fed.R.Civ.P. 12(b)(6), which is made applicable to adversary proceedings in bankruptcy by Bankr.R.Pro. 7012(b).

## B. <u>Count II</u> - Misrepresentation and Fraudulent Suppression

### 1. Ms. Freeman's misrepresentation claim is incongruous and fails to meet the specificity requirements of Fed.R.Civ.P. 9(b).

In <u>Count II</u> of her complaint, Ms. Freeman alleged that, "The Defendants fraudulently misrepresented to Plaintiff that they would perform a proper title search on the property and would properly close the loans," and that they were "qualified to do this." <u>First Amended Complaint</u>, page 12, paragraph 51.

In <u>Count II</u> Ms. Freeman combined alleged representations made by three or more separate defendants to her in relation to three different transactions. Federal

---

§ 506(c), which provides, "The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." <u>Id</u>. The Supreme Court concluded, primarily based on the plain language of the statute, that the power to invoke section 506(c) belonged strictly to the trustee because the trustee was the party upon whom the statute expressly bestowed the right to invoke its provisions. Its opinion in <u>Hartford</u> reads:

> In answering this question, we begin with the understanding that Congress "says in a statute what it means and means in a statute what it says there," <u>Connecticut Nat. Bank v. Germain</u>, 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). As we have previously noted in construing another provision of § 506, when "the statute's language is plain, 'the sole function of the courts' "--at least where the disposition required by the text is not absurd--" 'is to enforce it according to its terms.' " <u>United States v. Ron Pair Enterprises, Inc.</u>, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)(quoting <u>Caminetti v. United States</u>, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917)). Here, the statute appears quite plain in specifying who may use § 506(c)--"[t]he trustee."

530 U.S. at 6.

Likewise, section 108(a) is quite plain in specifying what actions its operation is limited to, i.e., actions commenced by a "trustee." Since section 108(a) only applies to actions commenced by a "trustee," and since Ms. Freeman is not a "trustee," section 108(a) would not have operated to extend her time for instituting her negligence and wantonness causes of actions even if her time for doing so had not expired prior to the date that she filed her bankruptcy case.

27

Rule of Civil Procedure 9(b) requires, "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." A plaintiff in a fraud action, in order to satisfy rule 9(b), "must allege (1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud." Brooks v. Blue Cross and Blue Shield of Florida, Inc., 116 F.3d 1364, 1380-1381 (11th Cir. 1997). In that regard, Ms. Freeman's Count II fails to satisfy Fed.R.Civ.P. 9(b).

In Count II, Ms. Freeman failed: (1) to name each defendant; (2) to identify precisely what each defendant supposedly told her; (3) to state how each said fraudulent statement was false and how she was misled by it; (4) to state the time when each allegedly fraudulent statement was made; (5) to state the location where each allegedly fraudulent statement was made; (6) to name or describe the person who made each allegedly fraudulent statement to her; or (7) to explain what each said defendant gained by making each allegedly fraudulent statement. Instead she combined all of the defendants and combined all of the alleged representations that they were supposed to have made.

In regard to Rule 9(b), a complaint in which a plaintiff "lumps" all of the defendants in his or her allegations of fraud and is not specific to each defendant, does not meet the test of Rule 9(b). Brooks v. Blue Cross and Blue Shield of Florida, Inc., 116 F.3d at 1381 (relying on Vicom, Inc. v. Harbridge Merchant Servs., Inc., 20 F.3d 771, 778 (7th Cir.1994)).

The court in Vicom, which was relied upon and quoted extensively by the Eleventh Circuit Court of Appeals in Brooks, explained in depth the problems of "lumping" and the relationship of that to Rule 9(b). The court's opinion reads:

Rule 9(b) states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The rule is said to serve three main purposes: (1) protecting a defendant's reputation from harm; (2) minimizing "strike suits" and "fishing expeditions"; and (3) providing notice of the claim to the adverse party. See Uni*Quality, Inc. v. Infotronx, Inc., 974 F.2d 918, 924 (7th Cir. 1992); DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir. 1987). Although some have questioned Rule 9(b)'s effectiveness in serving these purposes, the caselaw and commentary agree that the reference to "circumstances" in the rule requires "the plaintiff to state 'the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff.'" Uniquality, 974 F.2d at 923 (quoting Bankers Trust Co. v. Old World Republic Ins. Co., 959 F.2d 677, 683 (7th Cir. 1992)); see also Midwest Grinding Co. v. Spitz, 976 F.2d 1016, 1020 (7th Cir. 1992)(stating that in a RICO action

28

"the complaint must, at a minimum, describe the predicate acts with some specificity and 'state the time, place, and content of the alleged communications perpetrating the fraud'")(quoting <u>Graue Mill Dev. Corp. v. Colonial Bank & Trust Co.</u>, 927 F.2d 988, 992 (7th Cir. 1991)); <u>DiLeo v. Ernst & Young</u>, 901 F.2d 624, 627 (7th Cir.)(stating that Rule 9(b) "particularity" means "the who, what, when, where, and how: the first paragraph of any newspaper story"), <u>cert. denied</u>, 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990); 5 Wright & Miller, <u>supra</u>, § 1297, at 590.

The district court concluded that two RICO counts in Vicom's amended complaint failed to satisfy any of these particularized pleading requirements. The district court focused specifically on Vicom's failure to allege the specific identity of the individuals who made the alleged misrepresentations. Many of the allegations simply state that the misrepresentations were made "at the direction, under the supervision, or with the knowledge and consent" of all the defendants. Such pleading would appear to fall short of the standards set forth in the caselaw. Because fair notice is "[p]erhaps the most basic consideration" underlying Rule 9(b), Wright & Miller, <u>supra</u>, § 1298, at 648, the plaintiff who pleads fraud must "reasonably notify the defendants of their purported role in the scheme." <u>Midwest Grinding</u>, 976 F.2d at 1020. Therefore, in a case involving multiple defendants, such as the one before us, "the complaint should inform each defendant of the nature of his alleged participation in the fraud." <u>DiVittorio</u>, 822 F.2d at 1247; <u>see also Mills v. Polar Molecular Corp.</u>, 12 F.3d 1170, 1175 (2d Cir. 1993)("Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'"); <u>Balabanos v. North Am. Inv. Group, Ltd.</u>, 708 F.Supp. 1488, 1493 (N.D. Ill. 1988)(stating that in cases involving multiple defendants "the complaint should inform each defendant of the specific fraudulent acts that constitute the basis of the action against the particular defendant"). We previously have rejected complaints that have "lumped together" multiple defendants. For instance, in <u>Sears v. Likens</u>, 912 F.2d 889, 893 (7th Cir. 1990), we affirmed the district court's dismissal of the plaintiff's complaint with prejudice because the complaint was "bereft of any detail concerning who was involved in each allegedly fraudulent activity." Instead, "the complaint lump[ed] all the defendants together and [did] not specify who was involved in what activity." <u>Id</u>.; see also <u>Design, Inc. v. Synthetic Diamond Technology, Inc.</u>, 674 F.Supp. 1564, 1569 (N.D. Ill. 1987)(discussing the prohibition on lumping defendants together).

20 F.3d at 777-778 (footnotes omitted).

In additional to "lumping," in her complaint, Ms. Freeman did not define what she meant by the phrase "proper title search." Its meaning is not apparent. She did not: (1) indicate how the use of that phrase was false or how she was misled by it; (2) what she

did or did not do in reliance upon it; (3) or what the person who said those words gained from saying them.  She did not provide the name of, or otherwise describe, the person who said those words to her or who he or she worked for.  She did not say when or where those words were uttered to her.

Furthermore, Ms. Freeman did not define what she meant by the phrase "properly close the loan."  Its meaning is not apparent.  Again, she did not: (1) indicate how the use of that phrase was false or how she was misled by it; (2) what she did or did not do in reliance upon it; (3) or what the person who said those words gained from saying them.  She did not provide the name of, or otherwise describe, the person who said those words to her or who he or she worked for.  She did not say when or where those words were uttered to her.

Moreover, Ms. Freeman did not define what she means by the phrase "qualified to do this."  Again its meaning is not apparent.  And again, she did not: (1) indicate how the use of that phrase was false or how she was misled by it; (2) what she did or did not do in reliance upon it; (3) or what the person who said those words gained from saying them.  She did not provide the name of, or otherwise describe, the person who said those words to her or who he or she worked for.  She did not say when or where those words were uttered to her.

The Court may not make assumptions about, or fill blanks in, Ms. Freeman's <u>Count II</u>.  Based on the information available, the Court must find that <u>Count II</u> must be dismissed because it does not satisfy Fed.R.Civ.P. 9(b).

In addition, <u>Count II</u> does not state a valid claim against either First Title or Title Source for another reason.  Nothing in the complaint suggests that either First Title or Title Source ever told Ms. Freeman anything or that she ever reviewed any report or other document prepared by either of those defendants in connection with any of the closings.  Consequently, there was no representation made by either of those defendants to Ms. Freeman, either verbal or written, which can form the basis of a fraud claim.

### 2.  <u>Count III</u> and <u>Count V</u>  - Fraudulent Suppression and Fiduciary Duty

**Ms. Freeman has stated no
fraudulent suppression claim against either
First Title or Title Source but may
theoretically have one against Ameriquest and Fidelity**.

In <u>Count III</u> of her complaint, Ms. Freeman has alleged that, "At each of the loan closings, Defendants suppressed from Plaintiff that she did not have sole title to the property and that the property had other liens or encumbrances other than the mortgage to Ameriquest."  <u>First Amended Complaint</u>, page 13, paragraph 62.  She has

furthermore alleged that the "Defendants," "were under a duty to communicate..." the facts which they allegedly failed to divulge to her, "... due to the relationship between the parties, or from the particular circumstances of the case." First Amended Complaint, page 13, paragraph 61.

In Count V of her complaint, Ms. Freeman alleged that, "The Defendants breached their fiduciary duty by failing to notify Plaintiff of the title defect on her property and the existence of judgment tax liens against the property." First Amended Complaint, page 15, paragraph 81.

Both Count III and Count V are based on the purported failure on the part of the "Defendants" to disclose material facts to Ms. Freeman, i.e., fraudulent suppression. Except for the fact that it alleges that the obligation or duty to communicate arose from a fiduciary relationship between the "Defendants" and her, the claim made by Ms. Freeman in Count V is identical to and redundant of the claims which she made in Count III.

The tort of fraudulent suppression is codified in section 6-5-102 of the Alabama statutes. That section reads:

> Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case.

Code of Ala., 1975, § 6-5-102.

The court in Henson v. Celtic Life Ins. Co., 621 So.2d 1268, 1273 (Ala. 1993) lists the elements of a cause of action for fraudulent suppression as:

> 1) the existence of an undisclosed material fact; 2) the defendant's duty to disclose the material fact; and 3) the defendant's intentional failure to disclose the material fact when nondisclosure is intended to induce detrimental action.

Id. at 1273 (citing Jim Walter Homes, Inc. v. Waldrop, 448 So.2d 301 (Ala.1983)).

That same court has considered the additional elements of: (a) whether suppression of the fact induced the plaintiff to act or to refrain from acting, and (b) whether the plaintiff suffered actual damage as a proximate result. State Farm Fire and Casualty Co. v. Owen, 729 So.2d 834, 837 (Ala. 1999).

The opinion in Owen also explains, "a party's mere silence as to a material fact does not constitute fraud unless that party is under a duty to disclose that fact." Id. And as indicated in the statute, a party's duty to disclose may exist as a result of a

31

confidential relation or from "particular circumstances."  The Owen opinion instructs that the trial court should decide as a matter of law whether such a duty exists.  Id at 839.

The test for determining whether "particular circumstances" have given rise to a duty to speak includes consideration of the following: "(1) the relation of the parties; (2) the value of the particular fact; (3) the relative knowledge of the parties; (4) the plaintiff's opportunity to ascertain the fact; (5) the customs of the trade...." Id. at 844.  They also include: (a) whether the parties are dealing at arm's length; and (b) other circumstances.  Henson v. Celtic Life Ins. Co., 621 So.2d at 1273.

Within that context, the relative knowledge of the parties of a fact, sometimes referred to as "superior knowledge," is not dispositive, but "should be balanced with other considerations," such as "the other party's opportunity to ascertain the fact."  State Farm Fire and Casualty Co. v. Owen, 729 So.2d at 843.  "'Superior knowledge of a fact, without more, does not impose upon a party a legal duty to disclose such information.'"  Id. (quoting Surrett v. TIG Premier Ins. Co., 869 F.Supp. 919, 925 (M.D. Ala. 1994)).  Also, a "defendant can be liable for suppression only if he had knowledge of the material fact he allegedly suppressed."  Id. at 837.

### a.  Count III and Count V fail the minimum specificity requirements of Fed.R.Civ.P. 9(b).

Ms. Freeman's Count III and Count V fail the minimum specificity requirements of Fed.R.Civ.P. 9(b).  In those counts, as in Count II, Ms. Freeman, "simply 'lumped together' all of the Defendants in [her] allegations of fraud."  Brooks v. Blue Cross and Blue Shield of Florida, Inc., 116 F.3d at 1381 (parenthetical added).  In each of her fraud counts, Ms. Freeman combined all the defendants, alleging against all defendants every act of purported malfeasance perpetrated on any occasion.  Consequently, each individual defendant is left to wonder what it was that it was supposed to have done or not done.

Ms. Freeman's complaint also contravenes the requirements of Fed.R.Civ.P. 9(b) because it contains no allegation of facts which support a conclusory declaration that she was owed a fiduciary duty by all of the "Defendants."  To the contrary, the circumstances which she has described in her complaint plainly indicate that she stood merely in a contractual relationship at best with Ameriquest and Fidelity and that she had no relationship with either First Title or Title Source.  And for one to be deemed the "fiduciary" of another requires a great deal more than simply a contractual relationship or the promise by the latter to do something for the former.  The court in K&C Dev. Corp. v. AmSouth Bank, 597 So.2d 671 (Ala. 1992) explained:

Courts have traditionally viewed the relationship between a bank and its customer as a creditor-debtor relationship that does not impose a fiduciary duty on the bank.  See Power Equipment Co. v. First Alabama Bank, 585 So.2d 1291 (Ala. 1991); Faith, Hope & Love, Inc. v. First

32

Alabama Bank of Talladega County, N.A., 496 So.2d 708 (Ala. 1986).
However, a fiduciary duty may arise when the customer reposes trust in
the bank and relies on the bank for financial advice, or in other special
circumstances. Bank of Red Bay v. King, 482 So.2d 274 (Ala. 1985);
Baylor v. Jordan, 445 So.2d 254 (Ala. 1984).

In Bank of Red Bay v. King, 482 So.2d 274 (Ala. 1985), a fiduciary
or confidential relationship was defined:

> " '[Such a relationship is one in which] one person occupies
> toward another such a position of adviser or counselor as
> reasonably to inspire confidence that he will act in good faith
> for the other's interests, or when one person has gained the
> confidence of another and purports to act or advise with the
> other's interest in mind; where trust and confidence are
> reposed by one person in another who, as a result, gains an
> influence or superiority over the other; and it appears when
> the circumstances make it certain the parties do not deal on
> equal terms, but, on the one side, there is an overmastering
> influence, or, on the other, weakness, dependence, or trust,
> justifiably reposed; in both an unfair advantage is possible.
> It arises in cases in which confidence is reposed and
> accepted, or influence acquired, and in all the variety of
> relations in which dominion may be exercised by one person
> over another.' "15A C.J.S. Confidential (1967)."

482 So.2d at 284.

In determining whether the relationship between Kyatt and the
Bank evolved into a fiduciary relationship, we find Nettles v. First National
Bank of Birmingham, 388 So.2d 916 (Ala. 1980), to be instructive. Nettles
arose out of the foreclosure of a mortgage held by a bank on property
owned by Nettles and his company. Nettles had mortgaged both his own
property and that of the company to secure the company's debts. When
the company began to fail, the Bank made extensive efforts, in
cooperation with Nettles, to work out the debt. The efforts, however, were
fruitless, and the company failed. The mortgage was foreclosed and the
property later sold.

Nettles and his company sued the bank, claiming, among other
things, breach of a fiduciary duty. The trial court dismissed the complaint,
holding that the claims were barred by the statute of limitations. This
Court affirmed, holding that no fiduciary relationship existed between the
parties and that no such relationship was created by the parties' conduct.
This Court stated:

33

> "[The bank] took an active role in attempting to improve the Company's financial position: [the bank] made various recommendations, caused various documents to be prepared, made additional secured loans, and kept close tabs on the Company's operation. <u>Notwithstanding this active role, the essential relationship between the parties remained that of debtor-creditor, and the parties dealt with each other at arm's length.</u>"

388 So.2d at 920 (emphasis added).

In the present case, evidence in the record reveals that the Bank was far less involved in the company's affairs than was the bank in Nettles. Here, the Bank's only relationship with K & C and Kyatt was that of a creditor. The Bank neither assumed control of K & C nor attempted to give advice on K & C's day-to-day operational decisions. We conclude, therefore, that in the present case K & C and Kyatt failed to present substantial evidence of a fiduciary relationship between them and the Bank.

597 So.2d at 675-676.

Moreover, Ms. Freeman's conclusory allegation in <u>Count V</u>, to the effect that the "Defendants" all owed her a fiduciary duty, may be based on a premise that cannot be substantiated. Ms. Freeman claims that they owed her such a duty to do certain things merely because they undertook to do those things. Her complaint reads:

> 79. The Defendants had and/or undertook a duty to ensure that Plaintiff was the sole owner of the property and that the title was clear from any liens and/or defects on more than one occasion.

> 80. The Defendants had and/or undertook a duty not only to ensure that any and all existing mortgages and liens were fully satisfied and/or released, but also to make Plaintiff aware if the Defendants were unable to live up to their legal obligations to Plaintiff.

> 81. The Defendants breached their fiduciary duty by failing to notify Plaintiff of the title defect on her property and the existence of judgment tax liens against the property.

<u>First Amended Complaint</u>, page 15, paragraphs 79-81.

The Court is unaware of any Alabama case law which supports the proposition that one who undertakes to do something for someone else is under a "fiduciary duty" to accomplish what it was that he or she undertook to do. While one who voluntary

34

undertakes to act may incur a duty to perform that act in a non-negligent manner, Smith v. Atkinson, 771 So.2d 429, 433 (Ala. 2000), such undertaking does not impose a "fiduciary duty" on him or her.

### b. Counts III and V do not state claims upon which relief may be granted against any of the defendants based on nondisclosure of liens.

Neither Count III nor Count V states a claim upon which relief may be granted to the extent it purports to allege that any of the "Defendants" failed to disclose liens or encumbrances in connection with the transaction that closed on October 6, 1997. According to the complaint, the State of Alabama did not record its tax lien notice until May 6, 1998, and First Commercial Bank did not record its certificate of judgment until September 16, 1998. Consequently, on October 6, 1997, there were no liens or encumbrances to be disclosed by the "Defendants."

Neither Count III nor Count V states a claim upon which relief may be granted to the extent it purports to allege that any of the "Defendants" failed to disclose liens or encumbrances in connection with the transactions that closed on November 16, 1998, and November 21, 2000. Ms. Freeman did not allege that any of those "Defendants" knew about either the tax lien notice filed for record by the State of Alabama or the certificate of judgment filed for record by First Commercial Bank. To the contrary, she has alleged just the opposite. With respect to the November 16, 1998, loan closing, she has alleged that, "The defects in the title and the judgment and tax liens were not discovered because no title search was performed." First Amended Complaint, page 6, paragraph 22.

With respect to the November 21, 2000, loan closing, she alleged that, "The title search, or lack thereof also failed to reveal to Plaintiff and Defendants the existence of William Freeman's judgment liens and tax liens recorded against the property." First Amended Complaint, page 7, paragraph 23. Since, according to Ms. Freeman's complaint, none of the "Defendants" knew about the "liens," they cannot, as a matter of law, be guilty of fraudulent suppression in not disclosing the existence of those "liens" to Ms. Freeman. A "defendant can be liable for suppression only if he had knowledge of the material fact he allegedly suppressed." State Farm Fire and Casualty Co. v. Owen, 729 So.2d at 837.

### c. Counts III and V do not state any claims upon which relief may be granted against either First Title or Title Source for other reasons.

Neither Count III nor Count V states a claim upon which relief may be granted to the extent it purports to allege that either First Title or Title Source failed to disclose to Ms. Freeman that Mr. Freeman's name was still on the title to the property. As

35

indicated above, Ms. Freeman did not allege that either of those "Defendants" knew that Mr. Freeman's name was still on the title to the property. To the contrary, she has specifically alleged that because they did not conduct the title search, they failed to discover that fact. Since they did not know that Mr. Freeman's name was still on the title to the property, they cannot, as a matter of law, be guilty of fraudulent suppression in not disclosing that fact to Ms. Freeman. A "defendant can be liable for suppression only if he had knowledge of the material fact he allegedly suppressed." State Farm Fire and Casualty Co. v. Owen, 729 So.2d at 837.

Neither Count III nor Count V states a claim upon which relief may be granted to the extent it purports to allege that the defendant Title Source failed to divulge, in connection with the transaction that closed on October 6, 1997, that Ms. Freeman, "did not have sole title to the property and that the property had other liens or encumbrances other than the mortgage to Ameriquest." First Amended Complaint, page 13, paragraph 62. According to the Facts section of the complaint, Title Source was not involved in that transaction. Instead, First Title was to perform the title search involved in that transaction.

Neither Count III nor Count V states a claim upon which relief may be granted to the extent it purports to allege that the defendant First Title failed to divulge, in connection with the transactions that closed on November 16, 1998, and November 21, 2000, that Ms. Freeman, "did not have sole title to the property and that the property had other liens or encumbrances other than the mortgage to Ameriquest." First Amended Complaint, page 13, paragraph 62. Again, according to the Facts section of the complaint, First Title was not involved in those transactions. Instead, Title Source was to perform the title searches involved in those transactions.

Neither Count III nor Count V states a claim upon which relief may be granted to the extent it purports to allege that the defendant First Title failed to divulge, in connection with the transaction that closed on October 6, 1997, that Ms. Freeman, "did not have sole title to the property ...." First Amended Complaint, page 13, paragraph 62. Ms. Freeman's theory is that First Title had a duty to tell her that the title to the property had not been transferred into her name alone as she had been promised. But First Title could not have divulged that information to Ms. Freeman unless it had discovered it in the course of its title search. And, of course, such a discovery would have been impossible in connection with the October 6, 1997, closing, since any title search that was, or should have been, conducted in anticipation of the closing would have been completed prior to it, and therefore prior to the anticipated transfer from Mr. Freeman to Ms. Freeman.

**d. Counts III and V might otherwise state claims upon which relief may be granted against Ameriquest and Fidelity if those claims were not time barred.**

The Court construes Ms. Freeman's complaint to describe the following suppression theory against Ameriquest and Fidelity. Ms. Freeman actually told

36

employees or agents of both companies that she wanted her husband removed from the title to the property, that she wanted to have the property titled solely in her name; and that she wanted to obtain the loan in order to accomplish that purpose. Both the employees or agents of Ameriquest and the employees or agents of Fidelity told her in connection with the October 6, 1997, transaction that they could and would take the steps necessary to have her husband removed from the title to the property and to have the property titled solely in her name. However, the employees or agents of Ameriquest and the employees or agents of Fidelity did not take the steps necessary to have her husband removed from the title to the property and to have the property titled solely in her name. Furthermore, they did not tell Ms. Freeman, either on October 6, 1997, or on November 16, 1998, or on November 21, 2000, that they had not taken the steps necessary to have her husband's name removed from the title to the property and to have the property titled solely in her name.

Ms. Freeman theorizes that if she had been informed that Ameriquest and Fidelity had not taken the steps necessary to have her husband's name removed from the title to the property and to have the property titled solely in her name, she would have taken the necessary steps on her own to have her husband's name removed from the title to the property and to have the property titled solely in her name. She would have thereby prevented the liens filed by her husband's creditors from attaching to her property, or becoming a cloud on her title, or otherwise causing injury to her. In addition, she contends that if she had been informed of the actual facts on October 6, 1997, she would have taken the steps on her own necessary to have her husband removed from the title to the property and to have the property titled solely in her name and thereby prevented any of the three liens that were subsequently filed by her husband's creditors from attaching to her property or becoming clouds on her title. And if the actual facts had been divulged to her on either November 16, 1998, or November 21, 2000, she would have taken the steps on her own necessary to have her husband removed from the title to the property and to have the property titled solely in her name and thereby prevented Mountain Brook's lien from attaching to her property or becoming a cloud on her title. She concludes that she then would have been able to successfully consummate the sale of the property in November of 2002 and thereby avoided having to file her present bankruptcy case.

Construing Ms. Freeman's complaint as Ms. Freeman characterizes it, the Court would be unable to conclude that she failed to state a competent fraudulent suppression claim against Ameriquest and Fidelity, except for one fact – as discussed in detail below, the face of Ms. Freeman's complaint demonstrates that all of Ms. Freeman's fraud claims are time barred.

Case 04-00002-BGC    Doc 42    Filed 03/23/05    Entered 03/23/05 12:56:33    Desc Main
Document      Page 37 of 82

### 3. <u>Count II</u>, <u>Count III</u>, and <u>Count V</u> - Statute of Limitations

### Ms. Freeman's fraud causes of action are barred by the applicable two year statute of limitations.

#### a. Applicable law.

<u>Count II</u>, <u>Count III</u>, and <u>Count V</u> of Ms. Freeman's complaint contain her alleged fraud causes of action.  In <u>Count II</u>, she has alleged that the, "Defendants" made overt representations of material fact to her that were false.  In <u>Count III</u> and <u>Count V</u>, she alleged that the "Defendants" failed to disclose material facts to her.  Like other allegations, these are subject to a statute of limitations.

A cause of action for fraud, whether based on the misrepresentation of material fact or the suppression of material fact, is subject to a two year statute of limitations which begins to run when the fraud is, or should have been, first discovered.  As stated by the Alabama Supreme Court:

> An action alleging fraudulent misrepresentation is subject to a two-year statute of limitations. § 6-2-38(l ), Ala. Code 1975.  However, this statutory period does not begin to run until the date the plaintiff has actual or constructive notice of the fraud. § 6-2-3, Ala. Code 1975.  Thus, we have held that the period prescribed for filing a claim begins to run when the plaintiff, acting in the exercise of ordinary care, should have discovered the misrepresentation.  <u>Haines v. Tonning</u>, 579 So.2d 1308, 1309-10 (Ala. 1991).

<u>Lott v. Tarver</u>, 741 So.2d 394, 397 (Ala. 1999)(footnotes omitted).

A party is deemed to have "discovered" a fraud as a matter of law upon the first of either with the actual discovery of the fraud, or when the party becomes privy to facts that would provoke inquiry in a reasonable person that, if followed up, would lead to the discovery of the fraud.  <u>Dickinson v. Land Developers Const. Co., Inc.</u>, 882 So.2d 291, 298 (Ala. 2003).

The same holds true where the purported fraudulent suppression was accomplished by someone standing in a fiduciary relationship with the plaintiff, as is alleged by Ms. Freeman in her <u>Count V</u>.  A claim for breach of fiduciary duty must be filed within two years from the date that the cause of action accrued.  "Actions alleging negligence, wantonness, the tort of outrage, breach of fiduciary duty, or civil conspiracy must be brought within two years after the accrual of the cause of action. § 6-2-38(l), Ala. Code 1975."  <u>Travis v. Ziter</u>, 681 So.2d 1348, 1351 n.1 (Ala. 1996).

38

As in the case of other tort causes of action, a cause of action for breach of fiduciary duty accrues when the plaintiff first suffers a legal injury from the breach. System Dynamics Int'l, Inc. v. Boykin, 683 So.2d 419, 421 (Ala. 1996). However, if the defendant is the plaintiff's fiduciary when the cause of action accrues, and thereafter remains in that fiduciary capacity for a period of time, the limitations period does not begin to run until the fiduciary relationship is terminated. McCormack v. AmSouth Bank, 759 So.2d 538, 541 (Ala. 1999). And if the claimed breach of fiduciary duty is based on fraud, or, as in this case, fraudulent suppression, "where the statute has created a bar, the claim must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud, after which he must have two years within which to prosecute his action." Code of Ala., 1975, § 6-2-3.

In other words, just like every cause of action which seeks relief based on fraud, the statute of limitations for fraudulent suppression by a fiduciary is not considered to have accrued until the facts constituting the fraud are "discovered" by the plaintiff. "Facts constituting fraud are considered to have been discovered when they ought to have been discovered through reasonable diligence." Davis v. Brown, 513 So.2d 1001, 1003 (Ala. 1987). "Fraud is deemed to have been discovered when it ought to have been discovered. It is sufficient to begin the running of the statute of limitations that facts were known which would put a reasonable mind on notice that facts to support a claim of fraud might be discovered upon inquiry." Jefferson County Truck Growers Assoc. v. Tanner, 341 So.2d 485, 488 (Ala. 1977). "Furthermore, we have held that fraud is deemed to have been discovered when it ought to have been discovered; that is, at the time of the discovery of facts that would provoke inquiry by a person of ordinary prudence and which, if followed up, would lead to the discovery of the fraud." K&C Dev. Corp. v. AmSouth, 597 So.2d 671, 675 (Ala. 1992).

### b. Ms. Freeman was privy to facts that would have provoked inquiry in a reasonable person.

The root of Ms. Freeman's fraud contentions is that following the October 6, 1997, closing, the title to her property remained in her and Mr. Freeman's name, just as it was when she first contacted Ameriquest. She ostensibly alleges that certain of the "Defendants" either told her that they had done the proper things to have the title to the property placed in her name alone or failed to tell her that they had not taken the proper steps to have the title to the property placed in her name alone. But, as Ms. Freeman acknowledges in her complaint, a deed is necessary under Alabama law to effect the transfer of the legal title to real property, including the transfer by one joint owner of part of the legal title to another joint owner. Smith v. Smith, 820 So.2d 64, 70 (Ala. 2001). Her complaint reads, "Contrary to the representations made by the representatives of the Defendant, the Defendants' representatives failed to take the appropriate action to make sure that all the documentation that was necessary was filed of record, including a deed from William Freeman to the Plaintiff." First Amended Complaint, page 4, paragraph 16.

39

In order for a deed to be effective as a transfer of an interest in real property, it must be delivered to a person to whom the property interest is being transferred. "[A] deed is ineffective to transfer title if the deed is not delivered from the grantor to the grantee." Evans v. Waddell, 689 So.2d 23, 29 (Ala. 1997). Ms. Freeman did not receive a deed on October 6, 1997, on November 16, 1998, or on November 21, 2000, or at any point before or in between those dates. Since the purpose of the October 6, 1997, loan was specifically to effect the transfer by Mr. Freeman of that one-half of the title to her, it is inconceivable that the failure to receive a deed or similar document purportedly effecting that primary objection would not have provoked inquiry in the mind of a reasonable person standing in Ms. Freeman shoes. And had Ms. Freeman followed up by inquiring about her failure to receive a deed or other document effecting a transfer by Mr. Freeman of that one-half of the property's legal title to her, she would have discovered that Mr. Freeman had not executed a deed or other document of conveyance.

After the passage of a year, and then two, would not a reasonable person in Ms. Freeman's situation, after again not receiving a deed or document of conveyance in connection with either the November 16, 1998, closing, or the November 21, 2000, closing, have been compelled to wonder why, and inquire? And had she done so, she would have discovered on either occasion that Mr. Freeman had executed no such deed or other document of conveyance.

Ms. Freeman does not allege in her complaint that any of the defendants told her that they had obtained any such deed or document from Mr. Freeman. To the contrary, she merely presumed that everything necessary to effect the transfer of his interest in the property to her had been accomplished. Her complaint reads, "Plaintiff presumed a deed and/or whatever other documentation was necessary to place fee simple title of the property solely in her name had been obtained by Defendants because of their assurances to her that they had the knowledge and the expertise to handle such a transaction." First Amended Complaint, page 9, paragraph 35.

It was unreasonable for Ms. Freeman to have "presumed" on the occasion of any of the loan closings that a deed had been obtained when no one ever told her that and none had ever been delivered to her. And if she indeed presumed that a deed had been obtained, then she should have wondered why it had not been placed in her possession, which should have led her to demand that it be delivered to her or to question whether a transfer of title from Mr. Freeman had actually occurred. If she had done either, she would have discovered that Mr. Freeman's name was still on the title. Therefore, her failure to receive a deed, even though she presumed that she needed such a document, started the running of the two year limitations period, which expired well before Ms. Freeman's filed either her Chapter 13 case or the present adversary proceeding.

40

### c. Ms. Freeman had constructive knowledge of the alleged frauds.

Furthermore, it was a matter of public record that Mr. Freeman's name remained on the title to the property on October 7, 1997, and on November 17, 1998, and on November 22, 2000, and at all times during the period of time encompassed by Ms. Freeman's fraud allegations. Ms. Freeman's allegations make it clear that the deed which effectuated the transfer of the property to her and to Mr. Freeman to begin with, had been filed for record, and appears of record, in the appropriate probate office in the county in which the property is located. "'Under Ala. Code 1975, § 35-4-90, the proper recordation of an instrument constitutes "conclusive notice to all the world of everything that appears from the face" of the instrument.'" Lott v. Tarver, 741 So.2d 394, 398 (Ala. 1999)(quoting Haines v. Tonning, 579 So.2d 1308, 1310 (Ala.1991)(internal citations and quotation marks omitted). "'Thus, purchasers of real estate are "presumed to have examined the title records and knowledge of the contents of those records is imputed [to them].'" Id. (parenthetical in original).

By virtue of her original recorded deed, and the fact that no deed purporting to effect a transfer by Mr. Freeman to Ms Freeman of the one-half of the property's legal title had been recorded in the probate office, on each of the occasions that she was allegedly defrauded by the defendants, Ms. Freeman conclusively had constructive knowledge of information that should have put her on notice that the alleged representations she complains of were not true. She also had constructive knowledge of the information the defendants purportedly failed to disclose to her. With that constructive knowledge, she could have discovered any alleged fraud that was perpetrated against her in relation to the transactions that closed on those occasions.

In Lott v. Tarver, 741 So.2d 394 (Ala. 1999), the defendants listed their home for sale for $79,500. They offered to sell the house to the plaintiffs for $58,000 and the plaintiffs accepted. According to the plaintiffs, the defendants told them the house was subject to a 10-year mortgage and that they had been paying on the mortgage for approximately three years. The plaintiffs were unable to obtain bank financing and their attempt to assume the existing mortgage was also unsuccessful. On March 9, 1993, the plaintiffs entered into a contract to purchase the home pursuant to the execution of a wraparound vendor's lien deed which recited that the sale was subject to the existing mortgage that would be paid by the defendants. The purchase money consisted of $16,000.00 in cash and a promissory note for $42,000.00 payable with interest in eighty-four equal consecutive monthly installments.

In January 1996, the plaintiffs discovered from the defendants' mortgage company that the defendants had a 15-year mortgage and had made only one year's payments on the mortgage debt at the time the plaintiffs purchased the home. On January 27, 1997, the plaintiffs filed suit against the defendants for fraud. The trial court determined that the claim was barred by the statute of limitations and entered summary judgment for the defendants. On appeal, the plaintiffs contended that, even though the alleged misrepresentation occurred in March 1993, and they had not filed

their suit until January 1997, the statute had not expired because it did not begin to run until they discovered the fraud in January 1996. The Alabama Supreme Court rejected that argument, and affirmed the judgment of the trial court, on the grounds that the defendants' mortgage, which had been recorded in January 1992, provided the plaintiffs with constructive notice of its terms the moment that they purchased the property. That the court held should have led them to discover any alleged fraud perpetrated by the defendants. The court's opinion reads:

> Assuming, without deciding, that the Tarvers fraudulently misrepresented the number of years remaining on their mortgage debt, the Lotts had constructive knowledge of information that should have put them on notice that the alleged representation they complain of was not true; through the use of ordinary care, the Lotts should have been on notice from the moment they purchased the home in March 1993, because the Tarvers' mortgage had been recorded on January 24, 1992. Thus, the Lotts' fraud action, filed nearly four years after the date of the transaction in which the fraud is alleged to have occurred, is barred by the two-year statute of limitations. We therefore affirm the summary judgment.

741 So.2d at 398.

In Haines v. Tonning, 579 So.2d 1308 (Ala. 1991), on April 12, 1974, the defendants conveyed a tract of land to Burleson, who immediately recorded the deed. On July 28, 1975, the defendants conveyed a tract of land adjacent to Burleson's tract to the plaintiffs. In 1977, the plaintiffs began building a house on their tract and drilled a well for a water supply. In May 1987, a real estate broker who had been hired to sell Burleson's property discovered a 110-foot overlap in the deeds to Burleson and the plaintiffs. Both deeds purported to pass the same strip of land at the point where Burleson's tract and plaintiffs' tracts joined. The well drilled by the plaintiffs was on the disputed strip of land. On April 5, 1988, the plaintiffs sued the defendants for misrepresentation, a claim which the Defendants contended was barred by the statute of limitations. The trial court entered judgment against the defendants for $15,000.00 and they appealed. The Alabama Supreme Court reversed the judgment of the trial court after concluding that the defendants' recorded deed to Burleson gave the plaintiffs constructive notice of the overlap. The court held the statute of limitations begin to run when the defendants gave the plaintiffs their deed. The court's opinion reads:

> An action based on misrepresentation must be commenced within two years of the date of the plaintiff's actual or constructive notice of the misrepresentation. Ala. Code 1975, §§ 6-2-3, 6-2-38(l); Allen Group Leasing Corp. v. McGugin, 537 So.2d 22 (Ala. 1988). Thus, the period prescribed by the statute for filing a claim begins to run when the plaintiff, in the exercise of ordinary care, should have discovered the misrepresentation. Geans v. McCaig, 512 So.2d 1308 (Ala. 1987); Seybold v. Magnolia Land Co., 376 So.2d 1083 (Ala. 1979).

Under Ala. Code 1975, § 35-4-90, the proper recordation of an instrument constitutes "conclusive notice to all the world of everything that appears from the face" of the instrument. Christopher v. Shockley, 199 Ala. 681, 682, 75 So. 158, 158 (1917). Thus, purchasers of real estate are "presumed to have examined the title records and knowledge of the contents of those records is imputed [to them]." Walker v. Wilson, 469 So.2d 580, 582 (Ala. 1985) (quoting J.H. Morris, Inc. v. Indian Hill, Inc., 282 Ala. 443, 212 So.2d 831 (1968)).

As the Tonnings concede, the fact that Mr. and Mrs. Haines did not possess marketable title to the disputed tract at the time of the purported conveyance to the Tonnings was apparent on the face of the duly recorded deed from the Haineses to W.G. Burleson. The recordation of that deed provided constructive notice to the Tonnings regarding the alleged misrepresentation. Therefore, the period prescribed by the statute during which to file a claim alleging misrepresentation began no later than the execution of the deed from the Haineses to the Tonnings in 1975, and it ended in 1977--11 years before the initiation of this action.

579 So.2d 1309-1310.

In Girolando v. Group Investments Corp., 519 So.2d 907 (Ala. 1987), the defendant developed a residential subdivision with several additions. The first addition was developed from 1976 through 1978. A plat of that addition was recorded in the Probate Office of Jefferson County on January 13, 1977. After its development, a plat of the second addition was also recorded in that probate office in December 1978. On January 8, 1979, the defendant sold lot No. 42 of the second addition to plaintiffs. At the time of the closing on this lot, a representative of the defendant furnished the plaintiffs with a copy of the proposed restrictive covenants on the second addition. These documents stated that the restrictions were applicable to the first addition.

The defendant's representative informed the plaintiffs that the restrictive covenants of the first addition would also be applicable to the lots in the second addition, including the plaintiffs' lot. Immediately after their purchase, the plaintiffs began the construction of a dwelling house which was completed in five months. On November 1, 1979, a set of restrictive covenants specifically applicable to the second addition, and identical to those recorded on the first addition, was recorded in the Jefferson County Probate Office.

In May 1983, construction was begun on a dwelling house on lot No. 43 in the second addition adjoining plaintiffs' lot. The plaintiffs advised the defendant of their concern that this construction violated the setback restriction. Following up on their inquiry, the defendant met with the homebuilder at the site and determined that the home was being constructed in compliance with the restrictive covenants. In September 1983, the plaintiffs complained to defendants regarding a possible

43

noncompliance with restrictive covenants as related to construction of a dwelling house on lot No. 45 in the second addition. The defendants' subsequent investigation revealed a violation pertaining to the length of the home, and the builder was required to lengthen the dwelling to conform to the covenants.

On September 30, 1983, plaintiffs filed suit against the defendant for fraudulently misrepresenting that the restrictive covenants would protect plaintiffs' lot No. 42, in that the dwelling house later constructed on lot No. 43, though placed in violation of the setback line, was allowed by the defendants to remain. According to plaintiffs, they had no protection from the covenants because the restrictive covenants applicable to their lot were not recorded at the time they took title, but were only filed about ten months later. After trial, the trial court granted the defendants' motion for directed verdict and dismissed the plaintiffs' case with prejudice. The Alabama Supreme Court affirmed on the grounds that the defendants' alleged misrepresentation was not untrue, but even if it was untrue, the plaintiff had constructive notice that the restrictive covenants had not been filed for record when he purchased his lot. The court's opinion reads:

> If, on the other hand, that representation was untrue, did plaintiffs nevertheless have knowledge of facts that ought to have excited their inquiry and that, if pursued, would have led to knowledge of the unrecorded covenants? Halbrooks v. Jackson, 495 So.2d 591 (Ala. 1986). That question is answered by Mr. Giorlando's own testimony that he had in his possession a copy of the first addition covenants, which he perused. As a law-trained person and an experienced building contractor, Mr. Giorlando was put upon inquiry in 1979 as to whether the covenants were, in fact, recorded and did or did not provide protection for lot 42, assuming, arguendo, that the representation was untrue. Osborn v. Johns, 468 So.2d 103 (Ala. 1985). There is no evidence in the record to the contrary. Yet, this action was not filed until September 30, 1983, almost four years later. Thus, the one year statute of limitations applied, Code of 1975, § 6-2-39 (now repealed), and the action was time-barred.

519 So.2d at 910.

In Batchelor v. Batchelor, 502 So.2d 751 (Ala. 1987), the plaintiff and defendant were divorced from one another in 1979. In their divorce decree, the plaintiff was awarded the parties' home and the defendant was ordered to make all the payments on the mortgage. In 1980, the plaintiff told the defendant that she desired a smaller house. The two exchanged homes. The plaintiff received, in exchange for the couple's original home, a small house that had been purchased earlier that year by the defendant. The deed from the defendant to the plaintiff for the house she received in the exchange provided on its face that it was subject to a mortgage executed by the defendant on August 5, 1980. The deed was recorded with the judge of probate on August 12, 1980. On April 5, 1985, the plaintiff sued the defendant, alleging that at the time she exchanged houses with him, he told her that house she received in the exchange was

44

free and clear of all encumbrances. The trial court entered summary judgment for the defendant. On appeal, the Alabama Supreme Court affirmed on the basis that recordation of the deed provided the plaintiff with constructive notice of the encumbrance and, therefore, the statute of limitations began to run when the deed was recorded. The court's opinion reads:

> The plaintiff contends that she did not receive a copy of the deed because it was sent to the wrong address; therefore, she says, she was not aware of the misrepresentation at the time of the deed's execution and recordation.

> In Stokes v. Bryan, 42 Ala. App. 120, 154 So.2d 754 (1963), the plaintiffs purchased real estate from the defendant upon a representation by the defendant that he owned the property outright, when in fact he owned only an undivided interest. The court held that the plaintiffs were on constructive notice of the true nature of title to the property by virtue of the recordation of the deeds. Hence, the plaintiffs could not rely on the representations about ownership of the property to support their action for fraud.

> In line with these decisions, 54 C.J.S. Limitation of Actions § 189, at 194 (1948), notes:

>> "In conformity with the rule requiring the defrauded party to exercise diligence in discovering the fraud, it is generally held that, where the facts constituting or showing the fraud appear from the public records required by law to be kept and open to his inspection, his ignorance of the fraud will not postpone the operation of the statute and that limitations will run from the time the record was made. Record of a deed is within the rule just stated where the facts constituting the fraud appear on the face of the recorded deed...."

> Assuming, without deciding, that the defendant fraudulently misrepresented that the Lot 55 house was free and clear of encumbrances, the plaintiff had constructive knowledge of facts constituting the alleged fraud when the mortgage and deed were recorded on August 12, 1980. Thus, her action for fraud, filed nearly five years later, is barred by the applicable one-year statute of limitations. Code 1975, § 6-2-3 and § 6-2-39 (repealed effective 1985).

502 So.2d at 753.

In Smith v. Evans, 829 So.2d 774 (Ala. Civ. App. 2002), the plaintiff contacted the defendant in April 1988 regarding two unimproved lots that the latter had advertised

45

for sale in the newspaper.  The plaintiff told the defendant that he wanted to put a manufactured home on the property.  The defendant accompanied the plaintiff to the lots.  The defendant made several representations at that time, including that he had the property surveyed, that the two lots measured 150 feet by 100 feet, and that the back corners of the two lots were marked by a fence row and a large tree that he identified for the plaintiff.  The plaintiff paid the defendant $2,000 for the two lots.  The deed which the defendant gave the plaintiff described the lots with reference to a plat recorded in the county probate office.  The plaintiff did not examine the probate records concerning the plat before purchasing the property and did not have the lots surveyed. The plaintiff cleared and improved the lots and placed a manufactured home in the middle of where the plaintiff had indicated the boundaries to be.

In 1997, the plaintiff was contacted by the owner of two adjacent lots, who informed him that the manufactured home was encroaching on those lots.  The plaintiff then commissioned a survey of his property, which revealed that his manufactured home indeed was encroaching on the adjacent lots.  He then moved the manufactured home so that it was located upon his own property, incurring, among other things, costs of just over $11,000.00.  The plaintiff sued the defendant in February 1998, alleging that he had, in April 1988, committed fraud in representing the boundaries of the property.  The defendant moved for a summary judgment on the ground that the action was time-barred.  The motion was denied and the case was tried to a jury.  At the close of the evidence, the defendants moved for the entry of a judgment as a matter of law based upon the statute of limitations.  The trial court denied the motion, but gave the jury an instruction regarding that defense.  The jury returned a verdict against the defendant for $11,000.00.  On appeal, the Alabama Court of Civil Appeals reversed, holding that the action was time barred since the deed from the plaintiff to the defendant provided the latter with information from which he could have discovered the alleged fraud in April 1988.  The court's opinion reads:

In this case, Evans claims to have been told that one of the boundaries of the real property he sought to purchase was marked by landmarks that were not, in fact, located on lots 23 and 24 of Block 236 of the City of Bridgeport plat.  However, once the Smiths had given Evans a deed describing the land they were conveying as being numbered lots on a recorded plat open to public inspection, Evans was capable of examining that plat and determining that the actual dimensions of each lot were no greater than 150 feet by 50 feet.  After such an examination, Evans would have known that the boundary of his property was where it abutted the 10-foot-wide gap between lots 23 and 24 and lots 11 and 12, rather than a line indicated by landmarks that were not actually located on lots 23 and 24.  Moreover, Evans admitted at trial that had he examined the plat before purchasing the property, he would not have bought the property.

46

Although the question of when the party discovered or should have discovered the fraud is generally one for the jury, it may be decided as a matter of law where the plaintiff actually knew of facts that would have put a reasonable person on notice of the fraud.  See Liberty Nat'l Life Ins. Co. v. Parker, 703 So.2d 307, 308 (Ala. 1997).  Based upon the facts and authorities we have set forth, we conclude that the Smiths have demonstrated that Evans's claim was time-barred as a matter of law because he should have discovered the alleged fraud at the time he received his deed in April 1988, and that the trial court therefore erred in submitting to the jury the question of when Evans discovered the alleged fraud of Mr. Smith.  We reverse the trial court's judgment in favor of Evans and remand the cause for the entry of a judgment in favor of the Smiths.

829 So.2d at 777-778.

In Geans v. McCaig, 512 So.2d 1308 (Ala. 1987), the grantors of certain real estate gave the grantees a deed in 1979 describing the property conveyed as being two numbered lots and part of a third numbered lot "'in Government Park Addition # 2, a subdivision in Colbert County, Alabama known and designated according to the plat in Map book 2, page 361 in the Office of the Judge of Probate.'"  512 So.2d at 1309.  However, in December 1983, the grantees sued the grantors, alleging that they had represented that the property consisted of five acres or more and that it extended to a fence on the southern boundary, but the property actually fell short of the fence by 100 feet and contained less than 2 ½ acres.  The trial court directed a verdict in favor of the grantors on the grounds that the suit was time barred.  It concluded that the grantees could have discovered the alleged fraud from records at the probate court by examining the plat referred to in their deed.  That document exhibited the dimensions of the lots.  On appeal, the Alabama Supreme Court affirmed.  The court's opinion reads:

The McCaigs raised the statute of limitations as a defense in their answer, but they did not file a motion for summary judgment.   In ruling on their motion for directed verdict, the court observed as follows:

"[T]he Court is of the opinion that this should have been discovered before now.   One reason is, I guess, the plat--the description on the deed which you received refers to lots and is of record and it shows the dimensions.   And I did some figuring in my office a few minutes ago, just real quick, and they are easy to see, just a rough estimate, maybe two or more acres--a little over two acres it looks like; and it's open to the public and you had an attorney, I believe, to draw up the deed and it reflects it in that.   And just going over to the courthouse and looking at the plat which shows the dimensions of the lots that you bought, and I think you are barred by the statute of limitations of one

47

year.  And that's what the Court is basing it on;  I think that's
a correct decision.  Anything else?
"Mr. Osborn:  Is the Court taking into consideration the
testimony in its verdict?  Directed verdict?
"By the Court:  Yes, I know a motion for summary judgment
was never filed; if it had been filed, we would have heard it
and I would have granted it before it ever came to trial;  it
wouldn't have gotten this far."

The trial court did not err in ruling as it did.

512 So.2d at 1309-1310.

In the present case, with the constructive knowledge that she possessed on
October 6, 1997, November 16, 1998, on November 21, 2000, and thereafter, Ms.
Freeman could have discovered any alleged fraud which had been perpetrated against
her in relation to the transaction closed on that date.

The fact that the probate records in Ms. Freeman's chain of title reflected, after
each one of the transactions, that Mr. Freeman's name was still on the title to the
property constitutes constructive knowledge to Ms. Freeman.  By virtue of that
constructive knowledge, Ms. Freeman knew or should have known that Mr. Freeman's
name had not been removed from the title to the property and the one-half of the legal
title had not been transferred.  Consequently, the two year statute of limitations with
respect to any fraud or fraudulent suppression of those facts in relation to any of the
particular transactions began to run immediately when Ms. Freeman first suffered injury
as a result of those frauds.

### C.  Count IV - Breach of Contract

**Ms. Freeman's contract cause of action against Ameriquest
is time barred and she failed to state a valid contract cause of
action against either Fidelity or Title Source**

**1.  Ms. Freeman's contract cause of
action against Ameriquest is time barred.**

In Count IV of her complaint, Ms. Freeman alleges claims against Ameriquest for
breach of contract.  She bases that action on the allegation that Ameriquest promised
to get, "the property... refinanced solely in her name and to confirm that title was solely
in her name."  First Amended Complaint, page 14, paragraph 69.

The statute of limitations for breach of contract is six years.  Code of Ala., 1975,
§§ 6-2-34(4), (9).  It begins to run when the contract is breached.  The court in Seybold
v. Magnolia Land Co., 376 So.2d 1083 (Ala. 1979) explained:

48

The statute of limitations begins to run when a cause of action on the contract accrues, which is to say, when the contract is breached. § 6-2-30, Ala. Code 1975.  Turner v. County Board of Education of Dale County, 360 So.2d 948 (Ala. 1978); League v. McDonald, 355 So.2d 695 (Ala. 1978); Lipscomb v. Tucker, 294 Ala. 246, 314 So.2d 840 (1975); Henslee v. Merritt, 263 Ala. 266, 82 So.2d 212 (1955); Esslinger v. Spragins, 236 Ala. 508, 183 So. 401 (1938).

"Breach" consists of the failure without legal excuse to perform any promise forming the whole or part of the contract.  17 Am. Jur. 2d Contracts s 441 at 897.  Where the defendant has agreed under the contract to do a particular thing, there is a breach and the right of action is complete upon his failure to do the particular thing he agreed to do.  17 Am. Jur. 2d, supra.

Id. at 1085.

Ameriquest's breach of its promise to see that the property was titled in Ms. Freeman's name alone, if any, occurred on October 6, 1997, when it was supposed to have performed that promise in connection with the loan provided to Ms. Freeman on that date.  Ms. Freeman did not file the present adversary proceeding until January 6, 2004, more than six years after her contract cause of action accrued.

As explained in note 2 above, section 108(a) of the Bankruptcy Code did not serve to extend Ms. Freeman's right to institute her action for breach of contract against Ameriquest.  As quoted above, that statute provides:

If applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or (2) two years after the order for relief.

11 U.S.C. § 108(a)(emphasis added).

By its plain language, section 108(a) applies only to a "trustee" and its operation is limited to actions commenced by a "trustee" and has no application to actions commenced by a bankruptcy debtor.  United States v. C.I.T. Construction Inc. of Texas, 944 F.2d 253, 259-260 (5th Cir. 1991); Cunningham v. Healthco, Inc., 824 F.2d 1448, 1460 (5th Cir. 1987); Motor Carrier Audit and Collection Co. v.  Lighting Products, Inc., 113 B.R. 424, 426 (N.D. Ill. 1989); Natco Industries, Inc. v. Federal Ins. Co., 69 B.R. 418, 419-420 (S.D.N.Y. 1987); Burroughs v. Local Acceptance Co. (In re Dickson), 432 F.Supp. 752, 756 (W.D.N.C. 1977); Wepsic v. Josephson (In re Wepsic), 231 B.R. 768,

Case 04-00002-BGC    Doc 42    Filed 03/23/05    Entered 03/23/05 12:56:33    Desc Main
Document      Page 49 of 82

777 (Bankr. S.D. Cal. 1998); Lawler v. Republic Bank Dallas (In re Lawler), 53 B.R. 166, 172 (Bankr. N.D. Tex. 1985); Tingley v. Harrison, 867 P.2d 960, 965 (Idaho 1994); Engine Rebuilders v. Seven Seas Import-Export & Merc., 615 P.2d 871, 874 (Mont. 1980); Besing v. Seeligson, Douglass, Falconer, & Van Eykel, 822 S.W.2d 107, 109 (Tex. Ct. App. 1991).

The Court in Hartford Underwriters Ins. Co. v. Union Planters Bank, 530 U.S. 1, 7 (2000), explained, "Where a statute... names the parties granted [the] right to invoke its provisions, ... such parties only may act." Id. at 7.  It also explained, "a situation in which a statute authorizes specific action and designates a particular party empowered to take it is surely among the least appropriate in which to presume nonexclusivity." Id. at 6.

Section 506(c) of the Bankruptcy Code provides, "The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." 11 U.S.C. § 506(c).  In Hartford, the Supreme Court concluded, primarily based on the plain language of the statute, that the power to invoke section 506(c) belonged strictly to the trustee because the trustee was the party upon whom the statute expressly bestowed the right to invoke its provisions.  The Court's opinion reads:

> In answering this question, we begin with the understanding that Congress "says in a statute what it means and means in a statute what it says there," Connecticut Nat. Bank v. Germain, 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992).  As we have previously noted in construing another provision of § 506, when "the statute's language is plain, 'the sole function of the courts' "--at least where the disposition required by the text is not absurd--" 'is to enforce it according to its terms.' " United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)(quoting Caminetti v. United States, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917)).  Here, the statute appears quite plain in specifying who may use § 506(c)--"[t]he trustee."

530 U.S. at 6.

Likewise, section 108(a) is quite plain in specifying what actions fall within its operation.  Since section 108(a) applies only to actions commenced by a "trustee," and since Ms. Freeman is not a "trustee," section 108(a) did not operate to extend her time for instituting her contract cause of action.

Ms. Freeman's contract cause of action, if any, against Ameriquest is therefore barred by the statute of limitations.  Therefore, her complaint, to the extent it proposes a cause of action for breach of contract against Ameriquest, fails to state a claim upon which relief may be granted.

50

## 2.  Ms. Freeman failed to state a breach
## of contract claim upon which relief may be granted
## against either Fidelity or Title Source.

Also in <u>Count IV</u> of her complaint, Ms. Freeman alleges causes of action against Fidelity and Title Source for breach of contract.  She has alleged that: (1) "Ameriquest contracted with Fidelity or Title Source to do the title search and provide title insurance," (2) she "was a third party beneficiary of the contract between Ameriquest and Fidelity and/or Title Source," and (3) "Fidelity and/or Title Source breached their contract with Ameriquest... by failing to perform a proper title search that would have discovered that Plaintiff was not the sole owner of the property and that the property had existing judgment and tax liens."  <u>First Amended Complaint</u>, page 14, paragraphs 71-72, respectively.

Based on the pleading, this Court finds that Title Source could not have possibly breached any contract in relation to the October 6, 1997, transaction since, according to Ms. Freeman's complaint, it was not involved in that transaction.  And any contract cause of action against either Fidelity or Title Source arising out of the October 6, 1997, transaction would be time barred for the same reasons enunciated in the preceding section with respect to Ms. Freeman's contract claim against Ameriquest.

Ms. Freeman's allegations with respect to the failure of anyone to discover that the property was not titled in her name alone are also without merit.  Essentially Ms. Freeman alleges that Fidelity or Title Source had a contractual duty to conduct title searches for Ameriquest and to provide title insurance to Ameriquest, and that they in fact breached those contractual obligations by failing to discover that the title was in both names.  But according to her own allegations, Ameriquest plainly knew, prior to October 6, 1997, that the property was not titled in her name alone because she told its representatives that the property was not titled in her name alone.  Hence the necessity for her request for Ameriquest to take the steps necessary to have the property titled solely in her name.

Ameriquest knew, on October 6, 1997, when it made the initial mortgage loan to Ms. Freeman, that her former husband's name remained on the property title.  But it elected to make the loan and accept a mortgage on the property as security anyway, based on its determination that the husband had no rights in the property by virtue of the divorce decree.  Since it did not require a conveyance by Mr. Freeman in connection with that transaction, or in connection with the latter two transactions either, Ameriquest knew, when it closed those transactions, that no conveyance from Mr. Freeman had been made or obtained.  Ms. Freeman's complaint reads:

> According to title insurance policies issued by Defendants during this initial re-financing and subsequent re-financings by Ameriquest, the Defendants relied solely upon the order of the Domestic Relations Court in making the determination that Jennifer Freeman was the sole owner of the subject property and that title was in her name.

51

<u>First Amended Complaint</u>, pages 4-5, paragraph 16.

Consequently, neither Fidelity nor Title Source could, as a matter of law, have breached any agreement to conduct a title search for or provide title insurance to Ameriquest by failing to "discover" that Mr. Freeman's name remained on the title.

Similarly, neither Fidelity nor Title Source's purported failure to "discover" any alleged liens (which may have been created as a result of certificates of judgment or tax notices being filed for record in the probate court by <u>Mr. Freeman's</u> creditors), could have constituted a breach of any agreement they may have made to conduct a title search for Ameriquest. Certainly, they could not have discovered any such documents in connection with the October 6, 1997, transaction since no such certificates had been filed as of that date. And once Ms. Freeman transferred the property to Ameriquest on October 6, 1997, Fidelity and Title Source were required to examine the indices in the probate court only under the name of Ms. Freeman. With such searches, they would not have discovered certificates of judgment reflecting judgments entered against Mr. Freeman or tax notices bearing only Mr. Freeman's name. <u>Wallace v. Frontier Bank, N.A.</u>, 2004 WL 2914920, *7 (Ala., Dec. 17, 2004); <u>Rolling "R" Construction, Inc. v. Dodd</u>, 477 So.2d 330, 331-333 (Ala. 1985); <u>Jefferson County v. Mosley</u>, 284 Ala. 593, 226 So.2d 652 (1969).

This Court knows of no statute or other legal authority which imposes a duty on a title examiner to search outside the <u>purchaser's</u> chain of title. Consequently, there is no legal basis for Ms. Freeman's allegation that "Fidelity and/or Title Source breached their contract with Ameriquest, to which she claims to be a third-party beneficiary, by failing to perform a proper title search. Such a search, Ms. Freeman contends, would have discovered that Plaintiff was not the sole owner of the property and that the property had existing judgment and tax liens. To the contrary, title searches performed <u>for Ameriquest</u> on November 16, 1998, and November 21, 2000, would not have resulted in those discoveries.

There are inherent problems with Ms. Freeman's contention that any title search, which was supposed to have been performed for Ameriquest, in connection with either the second and third transactions was for her benefit. A single abstract could not have served the purpose of benefitting both Ameriquest and Ms. Freeman, i,e, a single abstract could not have protected Ameriquest from transfers made or encumbrances created by Ms. Freeman and also protected Ms. Freeman from transfers made or encumbrances created by Mr. Freeman. That is because an abstract compiled for Ameriquest's protection would have required a title search in Ms. Freeman's name. An abstract compiled for Ms. Freeman's protection would have required a title search in Mr. Freeman's. That means that <u>two separate title searches</u> would have been required to protect both Ameriquest and Ms. Freeman.

Furthermore, any title search performed for Ameriquest could not have directly benefitted Ms. Freeman. It would not have revealed to Ms. Freeman any transfers

made or encumbrances suffered by Mr. Freeman because Fidelity and/or Title Source had no duty to search outside of Ameriquest's chain of title. Wallace v. Frontier Bank, N.A., 2004 WL 2914920, *7 (Ala., Dec. 17, 2004); Rolling "R" Construction, Inc. v. Dodd, 477 So.2d 330, 331-333 (Ala. 1985); Jefferson County v. Mosley, 284 Ala. 593, 226 So.2d 652 (1969). Ameriquest's chain of title, on November 16, 1998, and on November 21, 2000, included transfers made and encumbrances created by Ms. Freeman, but not transfers made and encumbrances created by Mr. Freeman.

Again, once Ms. Freeman transferred the property to Ameriquest on October 6, 1997, Fidelity and Title Source were required to examine the indices in the probate court only under the name of Ms. Freeman. By doing so they would not have discovered the certificate of judgment reflecting a judgment entered against Mr. Freeman or the notice of tax lien bearing only his name.

Any title search or abstract prepared for Ameriquest in connection with the latter two transactions would only have been of indirect benefit to Ms. Freeman, by facilitating Ameriquest's decision to lend money secured by a mortgage on the subject property. Ms. Freeman, was not, therefore, as a matter of law, a third-party beneficiary of Ameriquest's alleged contract with Fidelity and/or Title Source because that contract was not intended for, and could not have had the effect of, bestowing a direct benefit on her. "A party claiming to be a third-party beneficiary of a contract must establish that the contracting parties intended, upon execution of the contract, to bestow a direct, as opposed to an incidental benefit upon the third party." Weathers Auto Glass, Inc. v. Alfa Mut. Ins. Co., 619 So.2d 1328, 1329 (Ala. 1993).

The definitive rule in Alabama jurisprudence on the liability of one who has contracted to conduct a title search in connection with a real estate transaction to ones other that he or she who commissioned the search is stated in Shine v. Nash Abstract & Investment Co., 217 Ala. 498, 117 So. 47 (1928). The court's opinion there reads:

> The weight of authority sustains the rule that one engaged in the business or calling of making abstracts of title to real estate for hire, under employment of a vendor, is not liable, because of negligence in the preparation of the abstract, to the vendee, in the absence of notice or knowledge that the abstract is to be furnished to, and used by, the vendee in consummating the sale of the property.
>
> ....
>
> But we are of opinion that sound reasoning and the weight of modern authority sustain the rule of liability for negligence resulting in injury to the vendee, where the vendor is under duty, or assumes the obligation, to furnish such abstract for the use of the vendee, and the person making the abstract on the vendor's order has knowledge or notice that the abstract is for such use, this on the ground that in such

53

circumstances the engagement of the abstracter by the vendor is a
contract made for the benefit of the vendee, and under such engagement
the abstracter owes the vendee, who is to use and rely on the abstract,
the duty of using reasonable care and skill in examining the records
affecting the title and making the abstract.

....

And it was not of consequence that the abstract of title is not
delivered to the vendee directly, but is delivered to the vendor for his use,
with knowledge or notice on the part of the abstracter that the vendee will
use and rely on the abstract in consummating the sale.  However, the
abstracter of titles is not a guarantor, unless he expressly so undertakes,
and, if liability exists, in the absence of express guaranty, it must be
grounded on negligence.

The rule of liability arising from contract made for the benefit of a
third person does not go to the extent of giving to a third party, whose
interest in the contract is merely indirect or incidental, but only to those
whose interest is direct, and out of which an immediate duty arises,
though the benefit may be postponed to the happening of a definite
contingency, and to sustain liability there must be "a debt or duty owing by
the promisee to the" third "party claiming the right to sue."

117 So. at 48-49.

As summarized above, the rule in <u>Shine</u> is that a title abstracter who has been
employed by a seller, is not liable, because of negligence in the preparation of the
abstract, to the purchaser, absent notice or knowledge that the abstract is to be
furnished to, and used by, the purchaser in consummating the sale of the property.
Conversely, where the seller is under a duty, or assumes the obligation, to furnish such
abstract for the use of the purchaser, and the person making the abstract on the seller's
order has knowledge or notice that the abstract is for such use, the abstracter owes the
purchaser the duty of using reasonable care and skill in examining the records affecting
the title and making the abstract.  This rule is based on the ground that in such
circumstances the engagement of the abstracter by the seller is a contract made for the
benefit of the purchaser.

Ms. Freeman's allegations with respect to the latter two transactions fall within
the general rule proclaimed in <u>Shines</u>.  That rule exempts title abstracters from liability
to those other than the party who contracted for their services.  According to her
allegations, Ms. Freeman did not know that no conveyance had been obtained from Mr.
Freeman.  Both Ameriquest and Fidelity assumed that no conveyance from Mr.
Freeman was necessary.  She therefore could not have told Fidelity or Title Source
about the "title defect," as she has characterized it, that existed with respect to that

54

problem when the latter two loans were closed. She did not know about any possible clouds on the title resulting from actions taken by Mr. Freeman's creditors. To the contrary, Ms. Freeman has specifically alleged that she did not know about anything of the sort. She, therefore, could not have provided any information regarding the same to Fidelity or Title Source.

Similarly, Ms. Freeman's complaint does not contain any allegation or suggestion that either Fidelity or Title Source were told about any possible clouds on the title resulting from actions taken by Mr. Freeman's creditors. She was not furnished, and did not use, any title abstract in consummating any of the transactions with Ameriquest. In fact, she claims that no title searches were conducted, and that no title abstracts were prepared, in connection with any of those transactions. And, although the title searches that Fidelity and Title Source were supposed to have performed, and the title abstracts that they were supposed to have prepared, in connection with those transactions were for a "purchaser," what Ms. Freeman has suggested they would have discovered were not in the "purchaser's" chain of title.

Those circumstances plainly reflect that Ms. Freeman was not furnished, and did not use any title searches performed or title abstracts prepared by Fidelity and Title Source. Fidelity and Title Source did not have notice or knowledge that any title abstract prepared by them would be furnished to or used by Ms. Freeman in connection with the two transactions. Under those circumstances, Fidelity and Title Source cannot, by virtue of Shine, be held liable in damages to Ms. Freeman for failing to search for or discover anything.

In contrast, Ms. Freeman contends that the circumstances she alleges except her from the operation of the general rule of nonliability enunciated in Shine. In support of that contention, she cited Steadman v. Central Alabama Title Co., 812 So.2d 290 (Ala. 2001) and Fox v. Title Guaranty and Abstract Co. of Mobile, Inc., 337 So.2d 1300 (Ala. 1976). As discussed above, this Court disagree that those cases are applicable or assist Ms. Freeman.

### D. Count VI - Quieting Title

**Ms. Freeman has stated a cause of action for quieting title against Mountain Brook but not against the other Defendants and not against Mountain Brook to the extent based on the other Defendants' alleged negligence.**

In Count VI of her complaint, which she has styled "Quiet Title," Ms. Freeman alleged that she is, "in peaceable possession of the property...." She adds, "the City of Mountain Brook claims some right, title or interest in, or encumbrance upon the disputed land, based upon a debt owed by William Freeman," and the City requests, "an order quieting title to her property and declaring that the lien of the City of Mountain

55

Brook does not attach to her property...." <u>First Amended Complaint</u>, page 16, paragraphs 85 through 88.

Code of Ala., 1975, § 6-6-540, which is entitled "Right of action to settle title to lands by person in peaceable possession thereof," provides:

> When any person is in peaceable possession of lands, whether actual or constructive, claiming to own the same, in his own right or as personal representative or guardian, and his title thereto, or any part thereof, is denied or disputed or any other person claims or is reputed to own the same, any part thereof, or any interest therein or to hold any lien or encumbrance thereon and no action is pending to enforce or test the validity of such title, claim, or encumbrance, such person or his personal representative or guardian, so in possession, may commence an action to settle the title to such lands and to clear up all doubts or disputes concerning the same.

Code of Ala., 1975, § 6-6-540.

Code of Ala., 1975, § 6-6-541 which specifies what a plaintiff's complaint must contain in order to state a cause of action under § 6-6-540, provides:

> The complaint authorized by Section 6-6-540 must describe the lands with certainty, must allege the possession and ownership of the plaintiff and that the defendant claims, or is reputed to claim, some right, title, or interest in, or encumbrance upon, such lands and must call upon him to set forth and specify his title, claim, interest, or encumbrance and how and by what instrument the same is derived and created.

Code of Ala., 1975, § 6-6-541.

Ms. Freeman's complaint alleges that she owns, and is in possession of, the property and that Mountain Brook claims an encumbrance on the property. But she alleges that Mountain Brook's purported encumbrance does not in fact attach to her property and she requests a finding that Mountain Brook's purported encumbrance does not attach to her property. <u>To that extent, Ms. Freeman states a claim for relief against Mountain Brook for quieting title under § 6-6-540</u>.

As to the other "Defendants," Ms. Freeman does not, as is required by the statutes, contend in <u>Count VI</u> that they claim an interest in the property; that they claim an interest in the property which is superior to hers; that she disputes any such interest claimed by any of them in the property; or that there exists any dispute with respect to any such interest.

In addition, an action to quiet title does not lie where the plaintiff has an adequate remedy at law, which Ms. Freeman has for the purported negligence of the "Defendants," via her cause of action for negligence.  <u>Cooper v. W.P. Brown & Sons Lumber Co.</u>, 214 Ala. 400, 108 So. 20, 22 (Ala. 1926).  Consequently, no cause of action for <u>quieting title</u> against the other "Defendants" for their alleged negligence is permitted or necessary.

## E.  <u>Count VII</u> - Tortiously Forcing Litigation

**There is no separate cause of<br>action for tortiously forcing someone to<br>become involved in litigation."**

In <u>Count VII</u> of her complaint, which she has styled "tortiously causing plaintiff to become involved in litigation," Ms. Freeman alleged:

> 90.  The natural and proximate result of the Defendants' wrongful acts was that the Plaintiff became involved in litigation with third persons, including the City of Mountain Brook and the other creditors.  In addition, Plaintiff was forced to file this Chapter 13 bankruptcy proceeding and to deal with all of her creditors in litigation in the Chapter 13 bankruptcy proceeding.

> 91.  The Plaintiff has incurred substantial attorneys fees in prosecuting this Chapter 13 bankruptcy case and in defending the title to her property.  The negligence, or fraud of the Defendants caused the Plaintiff to become involved in the litigation with the third parties.

<u>First Amended Complaint</u>, page 17, paragraphs 90-91.

There is no legal support cited to demonstrate an independent cause of action for tortiously causing someone to become involved in litigation.  The phrase implies that the effect, i.e., "causing someone to become involved in litigation," has a tort as its cause but that tort is not identified.  It does not therefore, state a cause of action independent of some other, yet unidentified, tort, but merely states the effect of that tort, or rather some malady that resulted from or was a foreseeable consequence of that tort.  If it were otherwise, then we would have enumerable causes of action, not based on the nature of a defendant's actions, but instead based on any type of the multitude of different situations which might result in damages being suffered by a plaintiff.

Specifically, Ms. Freeman claims that, "The natural and proximate result of the Defendants' <u>wrongful acts</u> was that the Plaintiff became involved in litigation with third persons, including the City of Mountain Brook and the other creditors," and that, "The

57

negligence or fraud of the Defendants caused the Plaintiff to become involved in litigation with the third parties." First Amended Complaint, page 17, paragraphs 90 and 91. Hence, by its own terms, Count VII is based on the "negligence and fraud of the Defendants." Those are of course the "Defendants' wrongful acts" that are described by Ms. Freeman elsewhere in her complaint. Consequently, Count VII does not state a claim for relief different from those claims stated by Ms. Freeman in her Counts I-III and V. In Count VII, Ms. Freeman has instead stated an effect of the wrongful acts that she described in her Counts I-III and V from which she has in turn purportedly incurred monetary damages. Count VII is therefore redundant and, to the extent it purports to state a separate tort, fails to state a claim upon which relief may be granted.

## F. Count VIII - Determination of Liens

**Ms. Freeman's complaint, which requests a "Determination of the Validity, Priority, or Extent of Liens," <u>states a claim for relief against Mountain Brook but does not against Ameriquest</u>.**

In Count VIII of her complaint, which she has styled "Determination of the Validity, Priority, or Extent of Liens," Ms. Freeman requests the Court to determine the nature, extent, and value of the interest held by Ameriquest in the property by virtue of its mortgage, and the nature, extent, and value of any interest held by Mountain Brook by virtue of its lien.

Count VIII states a claim upon which relief may be granted against Mountain Brook, although the relief requested is virtually identical to that which Ms. Freeman has requested in her Count VI.

Count VIII however, does not state a claim upon which relief may be granted against Ameriquest. Ms. Freeman's contention is that Ameriquest has a mortgage only on a half interest in the property because, according to her, that was all she had when she gave the mortgage to Ameriquest. In that regard, she has alleged that, when she filed her Chapter 13 case, "the title to the property was in the name of William Freeman and Jennifer Freeman," and that, for that reason, Ameriquest has only, "a mortgage on a one-half interest in the property." First Amended Complaint, page 18, paragraphs 93-94.

Those contentions are refuted by, and contradictory to, other contentions in the complaint. It is apparent from her other contentions, that when Ms. Freeman borrowed the money from Ameriquest, and gave the mortgage in return, she intended for the mortgage to encumber her entire interest in the property. At that time she believed that she owned 100% of the property, not just half. She has also alleged, and therefore admitted, that she received a quitclaim deed from Mr. Freeman for whatever title or interest he still had in the property prior to filing her Chapter 13 case. Specifically,

58

Count XI of Ms. Freeman's complaint contains the statement, "That the quit-claim deed executed by Plaintiff's ex-husband transferring his interest in the property to Plaintiff was recorded post-petition, and the transfer did not occur until recording...."  First Amended Complaint, page 20, paragraph 102.

Likewise, in Count XIII of her complaint, in support of the preference action alleged against Ameriquest, Ms. Freeman admitted that she received a deed from Mr. Freeman prior to bankruptcy.  That count includes:

> [I]t appears that any transfer occurring in this case in so far as perfection against the bankruptcy estate and the trustee is concerned, would not have occurred until it appeared of record that the Debtor was the owner of the property in full and fee simple.  Until that time, it cannot appear of record that Ameriquest had a mortgage on the Debtor's interest. Therefore, no transfer would have occurred in this case until the Deed from William Freeman to Jennifer Freeman was recorded in the Probate court.  Nonetheless, if this Court were to consider the transfers to have occurred prior to that date, said transfer occurred on or within 90 days prior to the bankruptcy filing.  Any such transfer also occurred on account of an antecedent debt and allowed the creditor to receive more than it would ever see in a Chapter 7 liquidation at the time of the transfer.  The Debtor was also presumed to be insolvent at the time of the alleged transfer. Therefore, if the court views the date of the deed as controlling, as opposed to the date of the recording of the deed insofar as a "transfer" is concerned, then any alleged transfer occurring prior to the bankruptcy filing was a preferential transfer under 11 U.S.C. § 547(b).

First Amended Complaint, page 21, paragraph 108.

In the section of her complaint styled "Facts," Ms. Freeman alleged that she was granted a divorce from Mr. Freeman on October 1, 1997.  She also alleged that prior to the divorce the property was owned jointly by Mr. Freeman and her.  She also alleges that the divorce decree required Mr. Freeman, "to transfer to Plaintiff all of his interest in the property...."  And that the decree required her, "to satisfy the mortgage on the property, and obtain a loan in her own name."  First Amended Complaint, page 3, paragraphs 9-13.

Prior to the entry of the divorce decree, according to those allegations, Ms. Freeman held a one-half interest in both the legal and equitable title to the property. Upon the entry of the divorce decree, which required Mr. Freeman to transfer his interest in the property, and no later than the point in time when she paid the prior mortgage with the funds loaned to her by Ameriquest on October 6, 1997, Ms. Freeman acquired equitable title to 100% of the property.  Mr. Freeman subsequently held only bare legal title in half of the property, which he held in trust for Ms. Freeman. Dependable Ins. Co. v. Kirkpatrick, 514 So.2d 804, 806 (Ala. 1987); Grass v. Ward, 451

59

So.2d 803, 806 (Ala. 1984); Touchstone v. Peterson, 443 So.2d 1219, 1224 (Ala. 1983); Hudson v. Hudson, 701 So.2d 13, 15-16 (Ala. Civ. App. 1997).

In Grass v. Ward, 451 So.2d 803 (Ala. 1984), the Alabama Supreme Court was faced with a fact situation almost identical to that involved here. There was a divorce decree and a subsequent non-delivery of a deed. Mabel Ward had been married to Ralph Thurman. Ralph, pursuant to a divorce decree, executed an instrument, on March 25, 1942, permitting Mabel to live in the house which they had held jointly as husband and wife so long as she made the mortgage payments. The instrument further provided that when the final payment on the mortgage was made he would execute a quitclaim deed conveying his interest in the property to Mabel. Mabel made all the mortgage payments and the mortgage was satisfied. But, although she continued to live in the house, she never received a deed to the house from her former husband.

After Mabel died, her daughter obtained a quitclaim deed to the house from her father, Ralph. The daughter subsequently brought suit against her stepfather, E.J. Ward, claiming title to the house and a right to possession by virtue of the deed. E.J. claimed possession of the house under a right of curtesy. The trial court concluded that Mabel, and hence E.J., by virtue of his right of curtesy, was entitled to the property, rather than the daughter, because Mabel became the equitable owner of the property when she satisfied the mortgage and became entitled to demand a deed to the house. The Alabama Supreme Court agreed and affirmed the trial court's decision. The court's opinion reads, "Because equity treats that as being done which should be done, we hold that once Mabel Ward complied with the terms of the agreement signed by Ralph Thurman, the real interest or equitable title passed to Mabel Ward, and Ralph Thurman held the legal title in trust for Mabel Ward." 451 So.2d at 806 (emphasis added).

In Hudson v. Hudson, 701 So.2d 13 (Ala. Civ. App. 1997), Curtis and Ruby Hudson were divorced after 40 years of marriage. Their primary asset was a 92 acre farm which they owned jointly. During the divorce proceedings, Ruby conveyed her interest in the farm to Curtis in exchange for his agreement to make a will leaving the property to her and their children after his death. The divorce decreed required Curtis to execute a will leaving his estate to his four children and to Ruby, share and share alike. After the divorce, Curtis entered into a common law marriage with Elizabeth. Curtis died. The primary asset of his estate was the farm that he and Ruby had owned jointly prior to their divorce. Elizabeth filed a claim in probate for a widow's share of the estate as Curtis' surviving spouse. The executor of Curtis's estate asked the trial court to declare that the divorce judgment and will created an equitable trust in the estate property for the benefit of Ruby and the four Hudson children and that the trust was sufficient to defeat the widow's claims as a surviving spouse. The trial court entered a judgment holding that no trust was created and that the widow was entitled to her elective share of Curtis's estate, including the farm. The Alabama Court of Appeals reversed, concluding, based on Grass v. Ward, 451 So.2d 803 (Ala. 1984), that Elizabeth could claim no interest in the property because upon entry of the divorce decree between Curtis and Ruby an equitable conversion occurred, after which Ruby

60

and the children held equitable title to the land and Curtis held only the bare legal title in trust for Ruby and the Children.  The court's opinion reads:

> The doctrine of equitable conversion applies to the case before us as well.   The terms of the judgment divorcing Ruby and Curtis Hudson required that Curtis make a will leaving his estate to his former wife and their children.  Ruby Hudson testified that because Curtis Hudson had agreed to do that, she accepted a smaller property settlement and a smaller amount of alimony than she would have accepted without that agreement.   When the trial court entered the divorce judgment requiring Curtis to execute the will, an equitable conversion occurred.   At that point, the real interest or equitable title in the estate passed to Ruby Hudson and the four Hudson children, and <u>all that remained to Curtis Hudson was the bare legal title, which he held in trust for Ruby Hudson and the children until his death.</u>

> ....

> Because we conclude that Ruby Hudson and the four Hudson children hold equitable title to Curtis Hudson's estate, we need not address other issues raised by the executor.   The judgment is due to be, and it is hereby, reversed, and the cause is remanded with instructions for the circuit court to enter a judgment declaring that Ruby Hudson and the four children of Curtis Hudson (Kenneth Wayne Hudson, Shirley Ann Hudson Intoccia, Anita Gail Hudson Lammers, and Terry Lee Hudson) are entitled to divide the property remaining in the estate of Curtis Hudson pursuant to the terms of his will.

701 So.2d at 15-16 (emphasis added).

In <u>Touchstone v. Peterson</u>, 443 So.2d 1219 (Ala. 1983), Touchstone purchased a ten-acre tract of land in 1953 and began living on the land.  In 1955, Touchstone sold the ten acres to Kirkland, intending to reserve for himself a life estate in the property. The deed, however, did not contain this reservation as the result of an error made by the scrivener who prepared the deed.  Despite this fact, a correction deed was never executed, since Touchstone and Kirkland had orally agreed and understood at the time of the sale that the former had reserved the right to live on the property for his life.  In 1956, Kirkland married Rosa Lee Peterson.  In 1977, Rosa Lee and Kirkland were divorced.  Pursuant to the terms of the divorce decree, she was awarded the ten-acre tract being occupied by Touchstone but the register's deed conveying the property to her was not executed and delivered to her until May 2, 1979.

Sometime in 1977, after the divorce, Rosa Lee visited the home of Touchstone, advised him that she had been awarded the ten acres, and requested that he move from the property.  He refused.  Two and one-half years later, when she received the

deed to the tract, Rosa Lee obtained a writ of ejectment from the county district court. Touchstone appealed to the county circuit court, where he filed a counterclaim against Rosa Lee, seeking reformation of the deed given to Kirkland by Touchstone, so as to reflect the life estate reserved by Touchstone. The circuit court entered an order denying reformation of the deed on the grounds that Rosa Lee was a bona fide purchaser for value under Code of Ala., 1975, § 35-4-153, which permits reformation of a deed, "insofar as this can be done without prejudice to rights acquired by third persons in good faith and for value." Id.

The Alabama Supreme Court concluded that the divorce decree gave Rosa Lee complete equitable title to the property, but that she was not a bona fide purchaser because she did not acquire the legal title to the same until after she had acquired knowledge of Touchstone's interest in the property. The court's opinion reads:

> [W]hen the divorce decree was entered, Peterson acquired only an equitable title to the subject ten acres; it was not until the register's deed was executed and delivered to her that her equitable title "ripened into a full legal title as against all equities and claims not known to her or notice of which she was not legally chargeable." Larkins v. Howard, 252 Ala. 9, 39 So.2d 224 (1949).
> ....
> Thus, since Rosa Peterson had actual knowledge of the Touchstones' prior equity before acquiring the legal title to the property, she cannot be deemed a bona fide purchaser.

443 So.2d at 1224

In Dependable Ins. Co. v. Kirkpatrick, 514 So.2d 804 (Ala. 1987), Elsie and G.T. Kirkpatrick were married in 1947. In 1968, G.T. entered into a 15-year agreement with Alabama Power Company for the use of a lake lot which contained a provision for a 15-year extension at the end of the primary term. In 1973, Elsie and G.T. were divorced. The divorce decree provided that the lake lot would remain G.T.'s property but Elsie would have the right to use it on the first and third weekends of each month and for four weeks during the summer each year. Elsie used the cabin frequently, had personal items there, and owned all the appliances and furniture in the cabin. In 1982, Dependable obtained a judgment against G.T. for $57,461.60. Pursuant to the judgment, G.T.'s interest in the property was sold by public sale and Dependable was the purchaser at the sale for $2,500.00. Prior to the judicial sale, attorneys for the parties entered into settlement negotiations. G.T.'s attorney informed Dependable's attorney that Elsie would litigate any attempt to dispose of the leasehold interest in the property. Dependable's agents, after confirmation of the sale, changed the locks on the cabin and removed certain items of personal property, including some ladies' clothing, and took it to the landfill. Dependable filed a declaratory judgment action seeking to determine the rights of Elsie to use the property. Elsie filed a counterclaim for conversion. The trial court held that Dependable succeeded to all the rights of G.T. in

the property except and subject to the right of Elsie to use it in accordance with the provisions of the divorce decree.

On appeal, the Alabama Supreme Court affirmed the trial court's decision that the interest acquired by Dependable at the execution sale was subject to the interest that Elsie acquired by virtue of the divorce decree. The court's opinion reads:

> Dependable first argues that the trial court incorrectly concluded that Elsie had the right to continue using the Lay Lake cabin in accordance with the terms of the divorce decree, notwithstanding the purchase by Dependable at the U.S. marshal's sale. The trial court correctly ruled that the purchaser at an execution sale acquires only such interest as the defendant in the execution had. Barksdale v. Beasley, 260 Ala. 148, 69 So.2d 280 (1953). The title acquired at an execution sale relates back to the inception of the lien and takes priority over all transfers and incumbrances made subsequent to such inception. Barber v. Beckett, 251 Ala. 569, 39 So.2d 17, 19 (1949). The purchaser at an execution sale does not acquire interests created, prior to the inception of the lien, in persons other than the defendant in the execution. Therefore, since Dependable acquired the interest of G.T. and his interest was subject to the interest of Elsie, Dependable's interest in the Lay Lake cabin is subject to Elsie's previously created interest.

514 So.2d at 806.

Applying the reasoning of the above cases, under Alabama law, Ms. Freeman became the real owner of the property in its entirety no later than the point in time when she paid the first mortgage with the funds loaned to her by Ameriquest on October 6, 1997. She held equitable title to the entire property and legal title to half of it. Mr. Freeman was left with only one-half of the property's bare legal title, which he held in trust strictly for Ms. Freeman's benefit. Ms. Freeman was free to grant a mortgage on the property, in its entirety, to Ameriquest, which she did on October 6, 1997, again on November 16, 1998, and again on November 21, 2000. "It is established by this court that the holder of an equitable title to real estate (24 C. J. 374, § 161) may, to the extent of his interest, give a valid mortgage as deed of trust thereon." First Nat'l Bank of Lincoln v. Cash, 220 Ala. 319, 125 So. 28, 36 (1929).

The same is true even as to the one-half of the legal title that Mr. Freeman continued to hold in trust for Ms. Freeman. As the Supreme Court, in the venerable case of Croxall v. Shererd, 72 U.S. 268 (1866) recognized:

> [I]t is immaterial whether his estate was legal or equitable. In the law, if real property, the principles which apply to estates of both kinds, with a few limited exceptions not affecting this case, are the same. In the consideration of a court of equity, the cestui que trust is actually seized of

63

the freehold. He may alien it, and any legal conveyance by him will have the same operation in equity upon the trust, as it would have had at law upon the legal estate.

The trust like the legal estate is descendible, devisable, alienable, and barrable by the act of the parties, and by matter of record. Generally, whatever is true at law of the legal estate, is true in equity of the trust estate.

72 U.S. at 281.

Furthermore, the mortgage which Ms. Freeman granted to Ameriquest on November 21, 2000, operated as a conveyance of not only what title she then had, but also of whatever title she might thereafter acquire. So that when Mr. Freeman eventually delivered a quitclaim deed to her, whatever passed by that deed, (specifically the one-half of the bare legal title that he had been holding in trust for Ms. Freeman), was in fact bound by and subject to Ameriquest's mortgage. The Alabama Supreme Court explained in Alabama Home Mortgage Co. v. Harris, 582 So.2d 1080, 1083 (Ala. 1991):

The record shows that in their mortgage to the Harrises the Robersons warranted the title to the property that was conveyed by the mortgage. Because of these warranties, any after-acquired interest of the Robersons would pass to the Harrises, as the Robersons are estopped to deny the title of the Harrises. See Lost Creek Coal & Mineral Land Co. v. Hendon, 215 Ala. 212, 110 So. 308 (1926). Thus, any interest, regardless of its nature, acquired by the Robersons after their execution of the mortgage to the Harrises would inure to the Harrises. See First Nat'l Bank of Lincoln v. Cash, 220 Ala. 319, 125 So. 28 (1929); Hunter v. Taylor, 189 Ala. 104, 66 So. 671 (1914); 59 C.J.S. Mortgages § 185 (1949). Because AHM had the absolute title to the property in question when it executed the quitclaim deed to the Robersons, AHM conveyed the absolute title to the Robersons in the May 27 quitclaim deed. When the absolute title was transferred to the Robersons, it ipso facto vested in the Harrises by virtue of the doctrine of after-acquired title.

582 So.2d at 1083.

Upon delivery by Mr. Freeman to Ms. Freeman by quitclaim, the one-half , bare legal title he had been holding for Ms. Freeman, inured instantly to the benefit of Ameriquest. See Steverson v. W.C. Agee & Co., 9 Ala. App. 389, 391, 63 So. 794, 797 (Ala. Ct. App. 1913) (parentheticals added). The court in Steverson explained "In the first place, it appears that the said mortgage from Rich to the defendant contained a warranty. By the operation of this, if Rich, though at the time he executed the mortgage he had no title, subsequently acquired one, it inured to the benefit of Steverson and eo

64

<u>instanti</u> vested in him as from the time of the execution of the mortgage." <u>Id</u>. [5]

---

[5]<u>See also</u>, <u>Harkins & Co. v. Lewis</u>, 535 So.2d 104, 114 (Ala. 1988)("After-acquired title to the land, or interest in land, intended to be and in fact covered by a conveyance, enures to the grantee in the conveyance.")(quoting <u>Wheeler v. Aycock</u>, 109 Ala. 146, 151, 19 So. 497, 499 (1895)); <u>Turner v. Lassiter</u>, 484 So.2d 378, 380 (Ala. 1985)(where grantors, who purported to convey all of the mineral interests in land, even though, at the time, they owned only an undivided one-half interest in said mineral rights, subsequently acquired the other one-half interest in said mineral rights, grantee immediately acquired title to all of the minerals under the doctrine of after acquired title); <u>Hollis v. Wallace</u>, 481 So.2d 875, 877 (Ala. 1985)("[U]nder the after-acquired-title doctrine, when a vendor sells land by warranty deed and afterwards acquires good title to the land, it passes to his vendee."); <u>Dominex, Inc. v. Key</u>, 456 So.2d 1047, 1058 (Ala. 1984)("The doctrine of after-acquired title... operates to estop a grantor, who executes a deed purporting to convey land to which he has no title or to which he has a defective title at the time of the conveyance, from claiming in opposition to his deed as against the grantee or any person claiming title under him, when such grantor afterward acquires a good title to the land."); <u>Floyd v. Andress</u>, 246 Ala. 301, 305, 20 So.2d 331, 334 (1944)("'It is established in this jurisdiction (1) that, where a mortgage contains covenants of warranty (section 6926, Code [Code 1940, Tit. 47, § 154]), after-acquired title inures to the benefit of the mortgagee, and the property embraced therein and so acquired is bound by the mortgage lien.'")(quoting <u>First Nat. Bank v. Cash</u>, 220 Ala. 319, 326, 125 So. 28, 34 (1929)); <u>First Nat'l Bank of Lincoln v. Cash</u>, 220 Ala. 319, 326, 125 So. 28, 34 (1929)("It is established in this jurisdiction (1) that, where a mortgage contains covenants of warranty (section 6926, Code), after-acquired title inures to the benefit of the mortgagee, and the property embraced therein and so acquired is bound by the mortgage lien."); <u>Lost Creek Coal & Mineral Land Co.</u>, 215 Ala. 212, 110 So. 308, 311 (1926)("It is a well-known rule that an after-acquired title by the grantor vests in the grantee or his successor, by virtue of his covenants of warranty, under the doctrine of estoppel."); <u>May v. Lowery</u>, 214 Ala. 230, 107 So. 67, 68 (Ala. 1925)(where one, by warranty deed, sells standing timber, additional rights obtained by him under subsequent contract inure to purchaser under warranty deed); <u>Porter v. Henderson</u>, 203 Ala. 312, 82 So. 668, 672 (Ala. 1919)("It is the settled law of this state that, if one having no title convey lands by express warranty or by the warranty which the law implies from the use of the words 'grant, bargain, sell, and convey,' and thereafter acquires title, such title will inure and pass <u>eo instanti</u> to his vendee."); <u>Cobbs v. Union Naval Stores Co.</u>, 202 Ala. 333, 80 So. 415, 416 (1918)("'In no state perhaps has the rule been more rigidly adhered to than in this 'that when one sells land to which he has no right, with warranty of title, and he afterwards acquires a good title, it passes instantly to his vendee, and he is estopped from denying that he had no right at the time of the sale.'")(quoting <u>Doolittle v. Robertson</u>, 109 Ala. 412, 19 So. 851 (1896)); <u>State v. Mobile & O.R. Co.</u>, 201 Ala. 271, 78 So. 47, 49 (1918)("The rule that a grantor's after-acquired title passes to his grantee under a former warranty deed is based upon principles of the highest morality; principles which ought to be, and which we think are, as binding upon the state as upon its citizens; and we think that the rule must therefore be accorded full operation and effect to the conclusion of the title against the state of Alabama in the case before us."); <u>Nance v. Walker</u>, 199 Ala. 218, 74 So. 339, 340 (1917)(a deed which conveyed "all my right, title, interest, estate, claims, and demand, both at law and in equity, as well as in possession or in expectancy, of, in, and to all that certain farm," etc., included and conveyed a subsequently acquired title to the land); <u>Hunter v. Taylor</u>, 189 Ala. 104, 66 So. 671, 672 (1914)("Now the mortgage executed by Lucy A. Brunley and her

65

The cause of action in <u>Count VIII</u> is based on the premise that Ms. Freeman owned only one-half of the property when she filed bankruptcy, and the conclusion that Ameriquest's mortgage extended to that half interest only. The Court disagrees.

According to the factual allegations in her complaint, Ms. Freeman has in fact owned the property in its entirety since she paid off the first mortgage. Mr. Freeman,

---

husband to Taylor bore covenants of warranty; and while, when executed, it did not effect to incumber the land until Reeves executed his conveyance to Mrs. Brunley, yet, when that conveyance from Reeves became effectual, as it did by delivery, the thus after-acquired title served to subject to the mortgage to Taylor the full title to lands described therein."); <u>Swift v. Doe Ex. Dem. Williams</u>, 162 Ala. 147, 50 So. 123, 124 (1909)("The deed from Grist to Thomas F. Stickney was a warranty deed, and, upon subsequent acquirement of title to the land in dispute by the grantor, that title inured to the benefit of the grantee, Stickney."); <u>Hall v. Slaughter</u>, 155 Ala. 625, 47 So. 103 (Ala. 1908)("So, if the mortgage was valid when executed, and, as contended by appellee, conveyed no more than an equity, it was sufficient to pass any afteracquired title in Williams at once to Hunt; and when Williams obtained his patent to the land, his title so acquired passed to Hunt under the mortgage, if the mortgage was valid."); <u>New England Mortgage Sec. Co. v. Fry</u>, 143 Ala. 637, 42 So. 57, 59 (1904)("The settled doctrine in this state is that if a person having at the time no title conveys land by warranty, and afterwards acquires a title, such title will inure and pass <u>eo instanti</u> to his grantee; and that the doctrine applies when the warranty is such as the law implies from the employment of the statutory words."); <u>Croft v. Thornton</u>, 125 Ala. 391, 28 So. 84 (Ala. 1900)("The objection to the introduction of these deeds, however, on the first ground specified,-that at the date of their execution the title was in the government,-was properly overruled, since each of the deeds contained covenants of warranty of title, and when the patent issued to Hendrix it inured at once to his grantee."); <u>Doolittle v. Robertson</u>, 109 Ala. 412, 19 So. 851 (1896)("In no state perhaps has the rule been more rigidly adhered to than in this that, when one sells land to which he has no right, with warranty of title, and he afterwards acquires a good title, it passes instantly to his vendee, and he is estopped from denying that he had no right at the time of the sale."); <u>Sayre v. Sheffield Land, Iron & Coal Co.</u>, 106 Ala. 440, 18 So. 101, 102 (1895)("'It is settled in this state that if one, having at the time no title, convey lands by warranty,-even the warranty which the law implies from the employment of the words 'grant, bargain, sell and convey,'-and afterwards acquires title, such title will inure and pass <u>eo instanti</u> to his vendee.'")(quoting <u>Chapman v. Abrahams</u>, 61 Ala. 108, 1878 WL 1017, *5 (1878)); <u>Stewart v. Anderson</u>, 10 Ala. 504, 1846 WL 496 *4 (1846)("[T]he reason why a title acquired by a mortgagor, inures to his mortgagee .... rests upon higher ground, viz: that as the mortgagor has, by his deed, impliedly asserted a right to pledge the premises by a conveyance in fee, he shall not be allowed to insist that he had a less estate, and whatever interest he afterwards acquires, shall vest in the mortgagee to make good the title which he professed to transfer."); <u>Kennedy v. Heirs of M'Cartney</u>, 4 Port. 141, 1836 WL 638, *8 (Ala. 1836)("Where one sells land to which he has no right, with warranty of title, and he afterwards acquires a good title, it passes instantly to his vendee, and he is estopped from denying that he had no right at the time of his sale."); <u>Steverson v. W.C. Agee & Co.</u>, 9 Ala. App. 389, 397, 63 So. 794, 797 (Ala. Ct. App. 1913)("In the first place, it appears that the said mortgage from Rich to the defendant contained a warranty. By the operation of this, if Rich, though at the time he executed the mortgage he had no title, subsequently acquired one, it inured to the benefit of Steverson and <u>eo instanti</u> vested in him as from the time of the execution of the mortgage.").

66

subsequent to that date, held only one-half of the property's bare legal title as trustee of the same for Ms. Freeman.  Consequently, the mortgage given by Ms. Freeman to Ameriquest on November 21, 2000 (and on October 6, 1997 and on November 16, 1998) effectuated the transfer of the property totally, as security for Ameriquest.

Furthermore, the nominal interest in the one-half of the property's legal title that remained in Mr. Freeman, which he held in trust only for the benefit of Ms. Freeman, instantly became subject to Ameriquest's mortgage when he delivered the quitclaim deed to Ms. Freeman prior to bankruptcy.  Based on the above, the Court finds that Count VIII does not provide a legal basis for granting relief against Ameriquest.

### G.  Count IX - Set Off

**Count IX contains the same deficiencies**
**as Count VIII and since Ms. Freeman's counts are being**
**dismissed, Ms. Freeman will not be entitled to setoff.**

Count IX of Ms. Freeman's complaint, which she has styled "Objection to Claim," contains the following allegations:

96.  Plaintiff hereby adopts and incorporates herein by reference the averments made in Paragraphs 1 through 95 as if fully set forth herein.

97.  The Debtor objects to the claim filed by Ameriquest in this case.  The claim has been filed as a fully secured claim.  However, the claim is not fully secured.

98.  The Debtor also asserts that she is also entitled to a set-off of any damages she is entitled to in this case against any claim that Ameriquest may have.

99.  The Debtor/Plaintiff is need of an order declaring the amount of Ameriquest's claim before and after any set-off of damages in this case and also declaring, to the extent Ameriquest has a claim, that claim is secured only by a one-half interest in the subject property.

First Amended Complaint, page 19, paragraphs 96-99.

To the extent that these allegations request a determination and declaration that Ameriquest's mortgage encumbers only half of the property, Count IX is identical to, and duplicates, Count VIII.  Based on the discussion above, the Court finds that there is no legal basis for granting the relief that Ms. Freeman has requested against Ameriquest in Count IX.

67

In addition, in <u>Count IX</u> Ms. Freeman requests the Court to setoff any damages which may be awarded against Ameriquest in this proceeding against that creditor's claim.  However, as decided elsewhere in this opinion, Ms. Freeman's complaint does not state a claim against Ameriquest upon which damages may be awarded.  Therefore, the request for a setoff in the amount of any such damages likewise does not state a basis for relief.  Consequently, <u>Count IX</u> fails in all respects to state a claim upon which relief may be granted against Ameriquest.

## H.  <u>Count X</u> - Equitable Subordination

### Ms. Freeman is not empowered to request equitable subordination of Ameriquest's claim.

<u>Count X</u> of Ms. Freeman's complaint, which she has styled "Equitable Subordination," contains the following allegations:

> 100.  Plaintiff hereby adopts and incorporates herein by reference the averments made in Paragraphs 1 through 99 as if fully set forth herein.

> 101.  Ameriquest has engaged in inequitable conduct that has effected this case.  The misconduct has resulted in injury to the creditors.  Furthermore, Ameriquest is attempting to benefit from its misconduct to the disadvantage of other claimants.  Ameriquest was acting as a fiduciary of the Debtor at the time it sought to take advantage of its position through its inequitable conduct.

> WHEREFORE, PREMISES CONSIDERED, Plaintiff requests this Court to enter an order subordinating the claim of Ameriquest to other claims in this case and for such other and further relief to which the Debtor and the estate are entitled.

<u>First Amended Complaint</u>, page 19, paragraphs 100-101.

The statutory authority for the relief requested by Ms. Freeman in <u>Count X</u> lies in 11 U.S.C. § 510(c).  That section provides:

> after notice and a hearing the court may (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate.

<u>Id</u>.

68

This Court's research demonstrates that Ms. Freeman is not authorized or empowered to bring an action for the equitable subordination of Ameriquest's claim pursuant to 11 U.S.C. § 510 (c).  See  Riccitelli v. U.S. Trustee (In re Riccitelli), 14 Fed. Appx. 57, 58, 2001 WL 754483, *1 (2nd Cir., July 5, 2001)(Unpublished opinion)("The purpose of equitable subordination is to remedy wrongdoing by one creditor, in the interests of the remaining creditors;  as a debtor, Riccitelli has no standing to seek relief under § 510."); Balcor/Morristown Ltd. Partnership v. Vector Whippany Assocs., 181 B.R. 781, 791 (D.N.J. 1995)("The debtor has no standing even to raise the equitable subordination doctrine."); Blumenberg v. Yihye (In re Blumenberg), 263 B.R. 704, 717 (Bankr. E.D.N.Y. 2001)("At the outset, the debtor lacks standing to bring an equitable subordination claim."); In re County of Orange, 219 B.R. 543, 557 (Bankr. C.D. Cal. 1997)("[T]he proper party to seek equitable subordination is the creditor or the trustee acting as representative of the creditor, not the debtor.  The debtors have no standing to raise the doctrine.")(quoting Weeks v. Kinslow (In re Weeks), 28 B.R. 958, 960 (Bankr. W.D. Okla. 1983)); Weeks v. Kinslow (In re Weeks), 28 B.R. 958, 960 (Bankr. W.D. Okla. 1983)("Thus, the proper party to seek equitable subordination is the creditor or the trustee acting as representative of the creditor, not the debtor.  The debtors have no standing to raise the doctrine."); Societa Int'l Turismo v. Barr (In re Lockwood), 14 B.R. 374, 381 (Bankr. E.D.N.Y. 1981)("The proper party to seek equitable subordination is the trustee.  In seeking to subordinate Plaintiff's claim to the claim of the other creditors, the trustee acts as the representative of the creditors, not the debtor.").

Consequently, Count X does not state a claim upon which relief may be granted against Ameriquest and must be dismissed.

## I.  Count XI - Postpetition Conveyance

**Ms. Freeman is not entitled to a declaration that
Mr. Freeman conveyed his interest in the property
to her postpetition.  The conveyance was complete
upon his prepetition delivery of the deed to her.**

Count XI of Ms. Freeman's complaint, which she has styled "Declaratory Relief," contains the following allegations:

102.  Plaintiff hereby adopts and incorporates herein by reference the averments made in Paragraphs 1 through 101 as if fully set forth herein.

103.  Plaintiff seeks relief in the form of an order from this court declaring the following:

a.  That the quit-claim deed executed by Plaintiff's ex-husband his interest in the property to Plaintiff was

69

recorded post-petition, and the transfer did not occur until recording, and

    b.  That none of the mortgages taken by Ameriquest on Plaintiff's property attached under 11 U.S.C. § 552(a), or in the alternative,

    c.  That the mortgages taken by Ameriquest on Plaintiffs property were unauthorized post-petition transfers, under 11 U.S.C. § 549(a)(1) to the extent that Plaintiff could only transfer her one-half interest in the property.

    WHEREFORE, PREMISES CONSIDERED, Plaintiff/Debtor requests this Court to enter an order declaring the transfer from Plaintiff's ex-husband to Plaintiff occurred at recording and post-petition, causing the mortgages of Ameriquest not to attach or to be unauthorized post-petition transfers.

First Amended Complaint, page 19-20, paragraphs 102-103.

    Count XI is based on the premise that Mr. Freeman's execution and delivery to Ms. Freeman of a quitclaim deed prior to bankruptcy did not effectuate a transfer of his interest in the property until it was recorded with the appropriate probate office.  The Court disagrees.

    Under Alabama law, a deed, once executed and delivered to the grantee named therein, effectuates a transfer of the subject property to said grantee and is not dependent upon recording for its efficacy.  Salter v. Hamiter, 887 So.2d 230, 237 (Ala. 2004); Payne v. Carver, 534 So.2d 566, 570 (Ala. 1988); White v. White, 350 So.2d 326 (Ala.1977); Murphree v. Smith, 291 Ala. 20, 24, 277 So.2d 327, 329 (1973); Watson v. Watson, 283 Ala. 214, 219, 215 So.2d 290, 295 (1968); Blewett v. Stallworth, 248 Ala. 242, 245, 27 So.2d 206, 209 (1946).

    Therefore, the deed from Mr. Freeman to Ms. Freeman, at the moment it was delivered, effected a prepetition conveyance of Mr. Freeman's one-half bare legal title.  Consequently, Ms. Freeman is not, as a matter of law, entitled to a declaration that the conveyance occurred postpetition.

    Furthermore sections 552 and 549 apply to postpetition events.  The postpetition acquisition of property by the debtor or the estate or the postpetition transfer of estate property, does not have any application to the prepetition conveyance from Mr. Freeman to Ms. Freeman.

    Because Ms. Freeman is not entitled to any of the relief that she has requested in Count XI, that count fails to state a claim against Ameriquest upon which relief may be granted.  It must therefore be dismissed.

**J. Count XII - Section 549(a) Avoidance**

**Section 549(a) cannot be employed to avoid
any portion of Ameriquest's mortgage lien
because the lien attached prior to bankruptcy
and was voluntarily given by Ms. Freeman.**

Count XII of Ms. Freeman's complaint, which bears the title"Setting Aside Post-Petition Transfer," contains the allegation, "Plaintiff seeks relief from this court in the form of setting aside the liens of Ameriquest on Plaintiffs property, to the extent that the Court finds that they are unauthorized post-petition transfers under 11 U.S.C. § 549(a)(1)." First Amended Complaint, page 20, paragraph 105.

As explained in the preceding sections, delivery of the deed by Mr. Freeman to Ms. Freeman effected a prepetition conveyance to Ms. Freeman of the one-half of the property's bare legal title that Mr. Freeman was holding in trust for her. As such Ameriquest's mortgage lien attached prepetition, and at the instant moment Mr. Freeman conveyed the interest he was holding in trust for to Ms. Freeman. According to the complaint, that occurred prior the filing of the bankruptcy petition.

Because Ameriquest's lien attached prepetition, it cannot, by definition, constitute a "post-petition transfer." Consequently, section 549(a) cannot be employed to avoid the attachment of Ameriquest's lien, which occurred prior to the commencement of Ms. Freeman's bankruptcy case. Section 549 authorizes the avoidance under appropriate circumstances of a, "transfer of property of the estate (1) that occurs after the commencement of the case...." 11 U.S.C. § 549(a)(1)(emphasis added).

Furthermore, section 549(a) empowers only a trustee to seek the avoidance of unauthorized post-petition transfers. It does not extend the same power to a bankruptcy debtor. The statute provides, "the trustee may avoid a transfer of property of the estate (1) that occurs after the commencement of the case; and (2) (A) that is authorized only under section 303(f) or 542(c) of this title; or (B) that is not authorized under this title or by the court." 11 U.S.C. § 549(a)(emphasis added). The statute does not allow the debtor to avoid a transfer of any sort or otherwise authorize a debtor to do anything. "Where a statute... names the parties granted [the] right to invoke its provisions,... such parties only may act." Hartford Underwiters Ins. Co. v. Union Planters Bank, 530 U.S. 1, 7 (2000). "[A] situation in which a statute authorizes specific action and designates a particular party empowered to take it is surely among the least appropriate in which to presume nonexclusivity." Id. at 6.

The subject in Hartford was the proper interpretation of 11 U.S.C. § 506(c), which provides, "The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of,

71

such property to the extent of any benefit to the holder of such claim." Id. The Supreme Court concluded, primarily based on the plain language of the statute, that the power to invoke section 506(c) belonged strictly to the trustee because the trustee was the party upon whom the statute expressly bestowed the right to invoke its provisions. The Court's opinion reads:

> In answering this question, we begin with the understanding that Congress "says in a statute what it means and means in a statute what it says there," Connecticut Nat. Bank v. Germain, 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). As we have previously noted in construing another provision of § 506, when "the statute's language is plain, 'the sole function of the courts' "--at least where the disposition required by the text is not absurd--" 'is to enforce it according to its terms.' " United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)(quoting Caminetti v. United States, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917)). Here, the statute appears quite plain in specifying who may use § 506(c)--"[t]he trustee."

530 U.S. at 6.

Like 506(c), section 549(a) is quite plain in specifying who may invoke its provisions, that is the trustee. Since section 549(a) may be employed only by a trustee to avoid a post-petition transfer, and since Ms. Freeman is not a trustee, she may not employ section 549(a) in her attempt to avoid Ameriquest's mortgage lien, unless some provision of the Bankruptcy Code other than section 549(a) permits her that right. That of course may be section 522.

A bankruptcy debtor is granted a limited right to exert the trustee's avoidance powers strictly for the purpose of protecting or fully exercising his or her exemption rights by 11 U.S.C. § 522. That section provides in part:

> (g)    Notwithstanding sections 550 and 551 of this title, the debtor may exempt under subsection (b) of this section property that the trustee recovers under sections 510(c)(2), 542, 543, 550, 551, or 553 of this title, to the extent that the debtor could have exempted such property under subsection (b) of this section if such property had not been transferred, if—
>
> (1)    (A)    such transfer was not a voluntary transfer of such property by the debtor; and
>
> (B)    the debtor did not conceal such property; or
>
> (2)    the debtor could have avoided such transfer under subsection (f)(2) of this section.
>
> (h)    The debtor may avoid a transfer of property of the debtor or recover a setoff to the extent that the debtor could have exempted such property under subsection (g)(1) of this section if the trustee had avoided such transfer, if—

72

(1)     such transfer is avoidable by the trustee under section 544, 545, 547, 548, 549, or 724(a) of this title or recoverable by the trustee under section 553 of this title; and

(2)     the trustee does not attempt to avoid such transfer.

(I)(1)  If the debtor avoids a transfer or recovers a setoff under subsection (f) or (h) of this section, the debtor may recover in the manner prescribed by, and subject to the limitations of section 550 of this title, the same as if the trustee had avoided such transfer, and may exempt any property so recovered under subsection (b) of this section.

(2)     Notwithstanding section 551 of this title, a transfer avoided under section 544, 545, 547, 548, <u>549</u>, or 724(a) of this title, under subsection (f) or (h) of this section, or property recovered under section 553 of this title, may be preserved for the benefit of the debtor to the extent that the debtor may exempt such property under subsection (g) of this section or paragraph (1) of this subsection.

(j)     Notwithstanding subsections (g) and (I) of this section, <u>the debtor may exempt a particular kind of property under subsections (g) and (I) of this section only to the extent that the debtor has exempted less property in value of such kind than that to which the debtor is entitled</u> under subsection (b) of this section.

11 U.S.C. § 522(g)-(j)(emphasis added).

Many courts agree that a Chapter 13 debtor may exercise the avoidance powers accorded in sections 544, 545, 547, 548, 549, or 724(a), but only to the extent permitted, and subject to the constraints and limitations provided for, in section 522. That section is the only source for such a statutory authority for a Chapter 13 debtor.[6]

---

[6]<u>Stangel v. United States (In re Stangel)</u>, 219 F.3d 498, 500-501 (5th Cir. 2000), <u>cert. denied</u>, 532 U.S. 910 (2001); <u>Realty Portfolio, Inc. v. Hamilton (In re Hamilton)</u>, 125 F.3d 292, 296-298 (5th Cir. 1997); <u>Hollar v. United States (In re Hollar)</u>, 174 B.R. 198, 203 (M.D.N.C. 1994), <u>aff'd in part and appeal dismissed in part</u>, 68 F.3d 460 (4th Cir. 1995); <u>U.S. v. Sierer</u>, 139 B.R. 752, 755 (N.D. Fla. 1991); <u>Willis v. Borg Warner Acceptance Corp. (In re Willis)</u>, 48 B.R. 295, 299 (S.D. Tex. 1985); <u>LaBarge v. Benda (In re Merrifield)</u>, 214 B.R. 362, 364-365 (8th Cir. BAP 1997); <u>Crawley v. Aurora Loan Services (In re Crawley)</u>, 318 B.R. 512, 515-516 (Bankr. W.D. Wis. 2004); <u>Ryker v. Current (In re Ryker)</u>, 315 B.R. 664, 667-670 (Bankr. D.N.J. 2004); <u>In re Hannah</u>, 316 B.R. 57, 62 (Bankr. D.N.J. 2004); <u>Patton v. State Street Bank (In re Patton)</u>, 314 B.R. 826, 831 (Bankr. D. Kan. 2004); <u>Carrasco v. Richardson (In re Richardson)</u>, 311 B.R. 302, 306 (Bankr. S.D. Fla. 2004); <u>Wood v. Mize (In re Wood)</u>, 301 B.R. 558, 562 (Bankr. W.D. Mo. 2003); <u>In re Binghi</u>, 299 B.R. 300, 306 (Bankr. S.D.N.Y. 2003); <u>In re Steck</u>, 298 B.R. 244, 248 (Bankr. D.N.J. 2003); <u>Quisenberry v. American State Bank</u>, 295 B.R. 855, 863 (Bankr. N.D. Tex. 2003); <u>Montouya v. Boyd (In re Montoya)</u>, 285 B.R. 490, 493 (Bankr. D.N.M. 2002);

Holcombe v. Debis Financial Services, Inc. (In re Holcombe), 284 B.R. 141, 143 (Bankr. N.D. Ala. 2001); Trentman v. Meritech Mortgage Services (In re Trenton), 278 B.R. 133, 135 (Bankr. N.D. Ohio 2002); In re Johnson, 262 B.R. 831, 844 (Bankr. D. Idaho 2001); Norwest Bank Minnesota, N.A., v. Andrews (In re Andrews), 262 B.R. 299, 302 (Bankr. M.D. Pa. 2001); Federal Home Loan Mortgage Corp. v. Talbot (In re Talbot), 254 B.R. 63, 66 (Bankr. D. Conn. 2000); Hacker v. Hodges (In re Hacker), 252 B.R. 221, 223 (Bankr. M.D. Fla. 2000); Miller v. Brotherhood Credit Union (In re Miller), 251 B.R. 770, 773 (Bankr. D. Mass. 2000); LR Partners, L.L.C. v. Steiner (In re Steiner), 251 B.R. 137, 139-140 (Bankr. D. Ariz. 2000); Cox v. Cox (In re Cox), 247 B.R. 556, 567 n.18 (Bankr. D. Mass. 2000); Smoot v. Swann Hill Condominium Unit Owners Association, Inc. (In re Smoot), 237 B.R. 875, 879 (Bankr. D. Md. 1999); Kildow v. EMC Mortgage Corp. (In re Kildow), 232 B.R. 686, 692 (Bankr. S.D. Ohio 1999); Braxton v. Bureau of Unemployment Compensation Benefits and Allowances (In re Braxton), 224 B.R. 564, 566 (Bankr. W.D. Pa. 1998); Stangel v. United States (In re Stangel), 222 B.R. 289, 293 (Bankr. N.D. Tex. 1998), appeal dismissed, 219 F.3d 498 (5th Cir. 2000), cert. denied, 532 U.S. 910 (2001); Compton v. Compton (In re Compton), 1998 WL 372659, *2 (Bankr. E.D. Pa., June 22, 1998); Herring v. United States (In re Herring), 224 B.R. 858, 860 (Bankr. N.D. Ga. 1997); Davis v. Victor Warren Properties, Inc. (In re Davis), 216 B.R. 898, 903 (Bankr. N.D. Ga. 1997); Carter v. H & B Jewelry & Loan (In re Carter), 209 B.R. 732, 733-734 (Bankr. D. Or. 1997); In re Hayles, 200 B.R. 26, 27-28 (Bankr. D.N.J. 1996); Lucero v. Green Tree Fin. Servicing Corp. (In re Lucero), 199 B.R. 742, 745 (Bankr. D.N.M. 1996); rev'd on other grounds, 203 B.R. 322 (10th Cir. BAP 1996); Perkins v. Gilbert (In re Perkins), 169 B.R. 455, 461-462 (Bankr. M.D. Ga. 1994); Cardillo v. Andover Bank (In re Cardillo), 169 B.R. 8, 11 (Bankr. D.N.H. 1994); McKeever v. McClandon (In re McKeever), 166 B.R. 648, 656 (Bankr. N.D. Ill. 1994); Pilgreen v. Brown & Williamson Fed. Credit Union (In re Pilgreen), 161 B.R. 552, 554 (Bankr. M.D. Ga. 1989); In re Maylin, 155 B.R. 605, 609 (Bankr. D. Me. 1993); Hill v. Fidelity Fin. Services (In re Hill), 152 B.R. 204, 206 (Bankr. S.D. Ohio 1993); In re Merrick, 151 B.R. 260, 262 (Bankr. D. Idaho 1993); Davis v. Suderov (In re Davis), 148 B.R. 165, 172 (Bankr. E.D.N.Y. 1992), aff'd, 169 B.R. 285 (E.D.N.Y. 1994); In re Redditt, 146 B.R. 693, 701 (Bankr. S.D. Miss. 1992); Coan v. United States (In re Coan), 134 B.R. 670, 671 (Bankr. M.D. Fla. 1991); In re Henderson, 133 B.R. 813, 817 (Bankr. W.D. Tex. 1991); In re Driver, 133 B.R. 476, 480 (Bankr. S.D. Ind. 1991); In re Perry, 131 B.R. 763, 769 (Bankr. D. Mass. 1991); In re Tillery, 124 B.R. 127, 128 (Bankr. M.D. Fla. 1991); Jardine v. Bennett's Eastside Paint and Glass (In re Jardine), 120 B.R. 559, 562 (Bankr. D. Idaho 1990); In re Williams, 109 B.R. 179, 180 (Bankr. W.D.N.C. 1989); Bruce v. Republic Bank-South Austin (In re Bruce), 96 B.R. 717, 720-722 (Bankr. W.D. Tex. 1989); In re Mattis, 93 B.R. 68, 69-70 (Bankr. E.D. Pa. 1988); Wernle v. Anapol (In re Wernly), 91 B.R. 702, 704 (Bankr. E.D. Pa. 1988); Perry v. United States (In re Perry), 90 B.R. 565, 567 (Bankr. S.D. Fla.1988); Mast v. Borgess Medical Center (In re Mast), 79 B.R. 981, 982 (Bankr. W.D. Mich. 1987); Pruitt v. Gramatan Investors Corp. (In re Pruitt), 72 B.R. 436, 439 (Bankr. E.D.N.Y. 1987); In re Driscoll, 57 B.R. 322, 325-326 (Bankr. W.D. Wis. 1986); United Penn Bank v. Dudley (In re Dudley), 38 B.R. 666, 668 (Bankr. M.D. Pa. 1984); In re Bennett, 35 B.R. 357, 359 (Bankr. N.D. Ill. 1984); Federal Nat'l Mortgage Assoc. v. Wheeler (In re Wheeler), 34 B.R. 818, 820-821 (Bankr. N.D. Ala. 1983); Coleman v. Home Savings Assoc. (In re Coleman), 21 B.R. 832, 835 (Bankr. S. D. Tex. 1982); Lucas v. Fayette (In re Lucas), 21 B.R. 794, 799 (Bankr. W.D. Mich. 1982); Tackett v. Dixon (In re Tackett), 21 B.R. 107, 108 (Bankr. D.N.M. 1982); Colandrea v. Colandrea (In re Colandrea), 17 B.R. 568, 583 (Bankr. D. Md. 1982); In re Saberman, 3 B.R. 316, 319-321 (Bankr. N.D. Ill. 1980); In re Carter, 2 B.R. 321, 322 (Bankr. D. Colo. 1980).

to the extent that he or she could have claimed the property transferred exempt pursuant to the provisions of section 522(g). Section 522(g) permits a Chapter 13 debtor to claim an exemption in property recovered by the trustee pursuant to an avoided transfer, but only if, "such transfer was not a <u>voluntary</u> transfer of such property by the debtor." 11 U.S.C. § 522 (emphasis added).

According to the allegations contained in Ms. Freeman's complaint, she voluntarily gave Ameriquest a mortgage in her property with the intent for the mortgage to cover her entire interest in the property. Therefore, Ms. Freeman would be unable to employ section 549(a) to avoid that transfer even had it not occurred until after she filed her bankruptcy petition because the transfer was not involuntary.

Furthermore, under Alabama law, the only exemption that Ms. Freeman may claim in the property is her homestead exemption, which is limited to $5,000.00. Code of Ala., 1975, § 6-10-2. As such, she could not have avoided Ameriquest's lien on that interest <u>in toto</u>. And if the proceeds from the sale that she has completed of the property are sufficient to satisfy her homestead exemption, she could not have avoided any portion of Ameriquest's lien.

### K. <u>Count XIII</u> - Prepetition Transfer

**Ms. Freeman cannot avoid Ameriquest's mortgage
as a preference because it was voluntarily given
and even if she had that authority
her preference contention is without merit.**

<u>Count XIII</u> of Ms. Freeman's complaint, which bears the title "Setting Aside Pre-Petition Transfer," contains the following allegations:

106. Plaintiff hereby adopts and incorporates herein by reference the averments made in Paragraphs 1 through 105 as if fully set forth herein.

107. Plaintiff seeks relief from this Court in the form of setting aside the liens of Ameriquest on Plaintiff's property, to the extent that the Court finds that they are pre-petition transfers because they are a preference, under 11 U.S.C. § 547(b).

108. Pursuant to 11 U.S.C. §547(e)(1)(A), a "transfer of real property" occurs when a "bonafide purchaser" cannot obtain title to the property superior to that of the alleged transferee under 11 U.S.C. § 547(b).

....

75

Nonetheless, if this Court were to consider the transfers to have occurred prior to that date, said transfer occurred on or within 90 days prior to the bankruptcy filing. Any such transfer also occurred on account of an antecedent debt and allowed the creditor to receive more than it would ever see in a Chapter 7 liquidation at the time of the transfer. The Debtor was also presumed to be insolvent at the time of the alleged transfer. Therefore, if the court views the date of the deed as controlling, as opposed to the date of the recording of the deed insofar as a "transfer" is concerned, then any alleged transfer occurring prior to the bankruptcy filing was a preferential transfer under 11 U.S.C.§ 547(b).

WHEREFORE, PREMISES CONSIDERED, Plaintiff/Debtor requests this Court to set aside Ameriquest's liens on Plaintiff's property to the extent that the Court finds they are pre-petition preferences, pursuant to 11 U.S.C.§ 549 [sic] and 550.

First Amended Complaint, page 21-22, paragraphs 106-108.

Ms. Freeman's theory is that because she did not own Mr. Freeman's one-half of the property's bare legal title until Mr. Freeman transferred that interest to her, Ameriquest's mortgage did not attach to that one-half of the property's bare legal title until that transfer occurred. She claims that the transfer occurred when the deed from Mr. Freeman to her was recorded post-petition. As discussed above, the Court disagrees; however, if the Court determines that the transfer took effect when the deed was delivered pre-petition, which it has, then the transfer is an avoidable preference as to Ameriquest because it took place within the 90 day period preceding bankruptcy.

### 1. Ms. Freeman may not avoid Ameriquest's mortgage because it was voluntarily given.

As indicated before, a Chapter 13 debtor, by virtue of the interplay between sections 522(h) and 522(g) of the Bankruptcy Code, may <u>not</u> avoid a voluntary transfer of his or her property.

Similarly, section 547(b) empowers only the trustee to seek the avoidance of preferential transfers. It does not extend the same power to a bankruptcy debtor. The statute provides:

the trustee may avoid any transfer of an interest of the debtor in property–
(1)     to or for the benefit of a creditor;
(2)     for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3)     made while the debtor was insolvent;
(4)     made--

76

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if--

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b)(emphasis added).

That section does not authorize a debtor to avoid a transfer of any sort or otherwise authorize a debtor to do anything. As quoted above, "Where a statute... names the parties granted [the] right to invoke its provisions, ... such parties only may act." Hartford Underwiters Ins. Co. v. Union Planters Bank, 530 U.S. 1, 7 (2000). And, "a situation in which a statute authorizes specific action and designates a particular party empowered to take it is surely among the least appropriate in which to presume nonexclusivity." Id. at 6. See the detailed discussion of Hartford above.

Again like section 506(c) and section 549(a), section 547(b) is quite plain in specifying who may invoke its provisions, that is the trustee. Since section 547(b) may be employed only by a trustee to avoid a post-petition transfer. Because Ms. Freeman is not a trustee, she may not employ section 547(b) in her attempt to avoid Ameriquest's mortgage lien unless some provision of the Bankruptcy Code other than section 547(b) permits her that right. Again, this Court has considered section 522. See the discussion above, and again, the Court finds Ms. Freeman may not benefit from section 522 here.

Again, according to the allegations contained in her complaint, Ms. Freeman voluntarily gave Ameriquest a mortgage in her property, fully intending for the mortgage to cover her entire interest in the property. Therefore, Ms. Freeman would be unable to employ section 547(b) to avoid that transfer, even if it had not been completed and perfected prior to the 90 day period which preceded her bankruptcy case, because the transfer was not involuntary.

And again, as this issue relates to section 547(b), under Alabama law, the only exemption that Ms. Freeman may claim in the property is her homestead exemption, which is limited to $5,000.00. Code of Ala., 1975, § 6-10-2. As such, she could not have avoided Ameriquest's lien on that interest in toto. And if the proceeds from the sale that she has completed of the property are sufficient to satisfy her homestead exemption, she could not have avoided any portion of Ameriquest's lien.

77

### 2.  There was no preference because Ameriquest's
### mortgage was created and perfected prior
### to the 90 day pre-bankruptcy period.

Section 547(b) of the Bankruptcy Code makes avoidable certain transfers of property made by a debtor within 90 days of the filing of the bankruptcy petition.  A transfer takes place, according to Section 547(e)(2)(B), at the time the transfer is perfected, if perfection occurs more than 10 days after the transfer took effect between the transferor and the transferee.  A transfer of real property is "perfected" when a bona fide purchaser of the property <u>from the debtor</u> cannot acquire an interest that is superior to the interest of the transferee in the property.  11 U.S.C. § 547(e)(1)(A).  Since a bona fide purchaser could only acquire rights in real property transferred by the debtor by virtue of state law, the "apparent command [in Section 547(e)(1)(A)] is to test the effectiveness of a transfer, as against the trustee, by the standards which applicable state law would enforce against a good faith purchaser."  <u>McKenzie v. Irving Trust Co.</u>, 323 U.S. 365, 370 (1945) (parenthetical added)  "The state standards which control the effectiveness of a transfer likewise determine the precise time when a transfer is deemed to have been made or perfected."  <u>Id.</u>  The determination of when a transfer is perfected for purposes of Section 547 must be made by reference to state law.  <u>In re Conner</u>, 733 F.2d 1560 (11th Cir. 1984).

Under Alabama law, a bona fide purchaser of real property is one who: (1) purchases legal title to the property; (2) in good faith; (3) for adequate consideration; and (4) without notice of any claim or interest in the property by any other party.  <u>Manning v. Wingo</u>, 577 So. 2d 865, 868 (Ala. 1991); <u>Perine v. Jackson</u>, 545 So. 2d 1318, 1319 (Ala. 1989); <u>Rolling "R" Construction, Inc.</u>, 477 So. 2d 330, 331-332 (Ala. 1985); <u>Larkins v. Howard</u>, 252 Ala. 9, 12, 39 So. 2d 224, 226 (1949).  In contrast, "One cannot be a bona purchaser where his grantor did not have the legal title to convey."  <u>Marsh v. Marsh</u>, 215 Ala. 571, 572, 112 So. 189 (1927), <u>overruled in part on other grounds</u>, <u>Gordon v. Ward</u>, 221 Ala. 173, 128 So. 217 (Ala. 1930).[7]

_____

[7]<u>See also</u>, <u>Manning v. Wingo</u>, 577 So. 2d 865 (Ala. 1991)(deed signed by will beneficiary and by another person as executor of the testator's estate was void where only the beneficiary was named as the grantor and the beneficiary did not own the property at the time of the conveyance, so that grantees named in deed were not bona fide purchasers for value); <u>Sherrod v. Hollywood Holding Corp.</u>, 233 Ala. 557, 173 So. 33 (1937)(where grantee in a deed held in escrow gave a mortgage before fulfillment of the escrow agreement, a purchaser of such mortgage was not protected as a bona fide purchaser against a purchase-money mortgage that was included in the original escrow agreement, since no title had passed pending delivery of the deed in escrow which could be conveyed); <u>Hess v. Hodges</u>, 201 Ala. 309, 78 So. 85 (1918)(where grantor did not have legal title because description in recorded deed to him was defective, his grantee could not be a bona fide purchaser of value without notice); <u>Gibson v. Gibson</u>, 200 Ala. 591, 76 So. 949 (1917)(grantee's mortgagee did not acquire legal title and was therefore not entitled to protection against vendor's lien resulting from payment of purchase price of property by a third party, where deed was delivered in escrow and grantee failed to

78

Until Mr. Freeman conveyed the one-half bare legal title, Ms. Freeman could not have transferred that one-half of the property's bare legal title to anyone else. Conversely, until Mr. Freeman conveyed the one-half bare legal title to Ms. Freeman, no one could have possibly acquired that one-half of the property's bare legal title from Ms. Freeman. Therefore, any purchaser who may have purported to purchase that one-half of the property's bare legal title from Ms. Freeman prior to Mr. Freeman's conveyance of it to her would not have acquired the "legal title" requisite to being a "bona fide purchaser" under Alabama law. And since the mortgage from Ms. Freeman to Ameriquest included any after-acquired title to the property, that one-half of the property's bare legal title became subject to and bound by that mortgage the instant the deed which accomplished that conveyance was delivered by Mr. Freeman to Ms. Freeman.

Consequently, there was no point in time during the 90 day period preceding the filing by Ms. Freeman of her bankruptcy case at which a purchaser could have acquired that one-half of the property's bare legal title free from Ameriquest's mortgage lien. Ms. Freeman, before the conveyance from Mr. Freeman, did not have that one-half of the property's bare legal title to transfer, and the instant the conveyance occurred, that one-half of the property's bare legal title was encumbered by Ameriquest's lien. It therefore, would have been prior in right to and perfected against any purchaser of that interest from Ms. Freeman subsequent to her acquisition of the same. And since Ameriquest's lien was, therefore, "perfected" against potential or hypothetical bona fide purchasers throughout the entire 90 day period, no "transfer," (as that term is defined in 11 U.S.C. § 547(e)(2)(B)), to Ameriquest which may be avoided pursuant to 11 U.S.C. § 547(b) occurred as a result of Mr. Freeman's conveyance to Ms. Freeman.

## L.  Count XIV - Bad Faith

### Ms. Freeman's complaint fails to state a claim for "bad faith" under Alabama law.

<u>Count XIV</u> of Ms. Freeman's complaint, which bears the title "Bad Faith," contains the following allegations:

109.  Plaintiff hereby adopts and incorporates herein by reference the averments made in Paragraphs 1 through 108 as if fully set forth herein.

110.  Defendant Fidelity is guilty of bad faith in failing to pay a claim to a third-party beneficiary.

---

perform his part of the agreement upon which delivery was dependent).

79

111. Ameriquest entered into a contract with Plaintiff to loan Plaintiff money, in exchange for a mortgage on Plaintiffs home. That contract called for Plaintiff to pay for and Defendants to provide a title search and title insurance. Plaintiff specifically requested of the Defendants that the property be refinanced solely in her name and to confirm that title was solely in her name.

112. Ameriquest contracted with Fidelity and/or Title Source to do the title search and provide title insurance.

113. Plaintiff was a third party beneficiary of the contract between Ameriquest and Fidelity and/or Title Source.

114. Fidelity and/or Title Source breached their contract with Ameriquest, as to which the Plaintiff was a third-party beneficiary, by failing to perform a proper title search that would have discovered that Plaintiff was not the sole owner of the property and that the property had existing judgment and tax liens.

115. Plaintiff made a claim on the title policy because of Fidelity's failure to perform a proper title search.

116. Fidelity failed to pay the Plaintiffs claim in bad faith, as she was a third-party beneficiary of the agreement for title insurance.

117. Fidelity's bad faith failure to pay caused Plaintiff damage.

118. As a result of Fidelity's actions, the Plaintiff has also suffered injuries, including emotional distress and mental anguish, damage to her reputation and credit history and other damage.

Wherefore, the Plaintiff demands compensatory and punitive damages from the Defendants in an amount to be determined by the fact-finder.

First Amended Complaint, pages 22-23, paragraphs 109-118.

Ms. Freeman has not alleged, and does not contend, that she had a direct insurance relationship with Fidelity. She does not contend that she was an express insured under an insurance policy or contract issued by Fidelity, or that Fidelity issued a policy of insurance to her, or that an insurance contract existed between her as the insured and Fidelity as the insurer. To the contrary, Ms. Freeman alleged that Ameriquest is the insured under the insurance policy issued by Fidelity and that she is merely a third party beneficiary of that contract. The complaint reads:

1. "Defendant Fidelity is guilty of bad faith in failing to pay a claim to a third-party beneficiary."
2. "Plaintiff was a third party beneficiary of the contract between Ameriquest and Fidelity and/or Title Source."
3. "Fidelity failed to pay the Plaintiffs claim in bad faith, as she was a third-party beneficiary of the agreement for title insurance."

Consequently, her complaint fails to state a claim upon which relief may be granted for bad-faith failure to pay an insurance claim. Under Alabama law, "it is well established that a party cannot bring an action against an insurance company for bad-faith failure to pay an insurance claim if the party does not have a direct contractual relationship with the insurance company." Williams v. State Farm Mutual Automobile Ins. Co., 886 So.2d 72, 75-76 (Ala. 2004). "[T]he tort of bad faith refusal to pay is that refusal to pay valid claims made by the insured of his insurance carrier." Stewart v. State Farm Ins. Co., 454 So.2d 513, 514 (Ala. 1984). "This Court has held repeatedly that the plaintiff in a bad faith case has the burden of proving that 'an insurance contract existed between the parties [plaintiff/insured, defendant/insurer] and a breach thereof by the defendant.'" Dickey v. Alabama Farm Bureau Mutual Ins. Co., 447 So.2d 693, 694 (Ala. 1984)(quoting National Security Fire & Casualty Co. v. Bowen, 417 So.2d 179, 183 (Ala. 1982)).

This general rule was recently, and emphatically, reiterated by the Alabama Supreme Court in Williams v. State Farm Mutual Automobile Ins. Co., in which it held that a third party cannot bring a claim of bad-faith failure to pay against an insurer of the party who injured the third party. The court's opinion reads:

However, it is well established that a party cannot bring an action against an insurance company for bad-faith failure to pay an insurance claim if the party does not have a direct contractual relationship with the insurance company. See, e.g., State Farm Fire & Cas. Co. v. Slade, 747 So.2d 293, 304 (Ala. 1999)(noting that "'[T]he plaintiff in a "bad faith refusal" case has the burden of proving: (a) an insurance contract between the parties and a breach thereof by the defendant ....'" (quoting National Sec. Fire & Cas. Co. v. Bowen, 417 So.2d 179, 183 (Ala. 1982)); Aplin v. American Sec. Ins. Co., 568 So.2d 757, 758 (Ala. 1990)(stating that "proof of the existence of an insurance contract between the parties is a threshold requirement in a bad faith claim"). This rule accords with the language of § 27-12-24, which is clearly directed at regulating insurers' contractual relationships with their insureds for the protection of the insureds, not third parties. It is undisputed that Williams has no contract of insurance with State Farm and that Williams procured no judgment against Shaw's estate before bringing his action against State Farm. Given the above, State Farm was entitled to a judgment as a matter of law.

81

886 So.2d at 75-76.

Since Ms. Freeman had no insurance contract with Fidelity, she has no cognizable cause of action against Fidelity for bad faith refusal to pay a claim. <u>Count XIV</u> of her complaint must, therefore, be dismissed.

### III. Conclusion

Based on the above, the Court concludes that <u>Counts I</u>, <u>II</u>, <u>III</u>, <u>IV</u>, <u>V</u>, <u>VII</u>, <u>IX</u>, <u>X</u>, <u>XI</u>, <u>XII</u>, <u>XIII</u>, and <u>XIV</u> of Ms. Freeman's complaint, as amended, are due to be dismissed, and <u>Counts VI</u> and <u>VIII</u>, as amended, are due to be dismissed with respect to all defendants except the City of Mountain Brook.

A separate order will be entered in conformity with this memorandum opinion.

Done this the 23rd day of March, 2005.

/s/Benjamin Cohen
BENJAMIN COHEN
United States Bankruptcy Judge

BC:pb

xc:    Walter McArdle, attorney
       Eric Ray, attorney
       Wendy Johnston, attorney
       Chapter 13 Trustee